**TORRINGTON EXTEND–A–CARE EMPLOYEE ASSOCIATION, A/W New England Health Care Employees, District 1199, National Union of Hospital and Health Care Employees, SEIU, AFL–CIO, CLC, Petitioner,**

**Beverly California Corporation, formerly known as Beverly Enterprises, its operating divisions, wholly owned subsidiaries, and individual facilities, Petitioner–Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent–Cross–Petitioner,**

**U.F.C.W. Locals 73A and 917, Intervenors.**

Nos. 2135, 2136 and 2137, Dockets 93–4016, 93–4038 and 93–4050.

United States Court of Appeals, Second Circuit.

Argued Aug. 12, 1993.

Decided Feb. 28, 1994.

582

James B. Coppes, Washington, D.C., (Jonathan P. Hiatt, Washington, D.C., of counsel), for Petitioner.

Warren M. Davison, Baltimore, Maryland, (Roger Darius Meade, Thomas P. Dowd, Littler, Mendelson, Fastiff & Tichy, Baltimore, Maryland, of counsel), for Petitioner–Cross–Respondent.

Robert J. Englehart, National Labor Relations Board, Washington, D.C. (Jerry M. Hunter, General Counsel, Yvonne T. Dixon, Acting Associate General Counsel, Nicholas E. Karatinos, Acting Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Linda Dreeben, Vincent J. Falvo, Jr., National Labor Relations Board, Washington, D.C., of counsel), for Respondent–Cross–Petitioner.

Before WINTER, MINER and WALKER, Circuit Judges.

WINTER, Circuit Judge:

The National Labor Relations Board concluded that petitioner-cross-respondent Beverly California Corporation ("Beverly"), a nationwide company that owns and operates 985 nursing homes, committed numerous unfair labor practices at various facilities between July 1986 and May 1988. Specifically, the Board concluded that Beverly committed over 130 violations of Section 8(a)(1), (3) and (5) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 158(a)(1), (3), and (5) (1988), at 33 of its facilities.

The consolidated unfair labor practice charges were heard by Administrative Law Judge ("ALJ") Martin J. Linsky. The Board affirmed the ALJ's decision with only minor modifications that will be detailed as necessary. The Board's order requires, *inter alia:* that Beverly make whole certain employees affected by the unfair labor practices; that Beverly bargain in good faith with its employees' bargaining representatives and provide relevant information when requested; and that Beverly post the usual notices at sites where unfair labor practices occurred and cease and desist from engaging in unfair labor practices at those facilities. In addition to the remedial provisions that concern the thirty-three facilities at which unfair labor practices occurred, the Board issued corporate-wide posting and cease and desist orders applicable to all of Beverly's nursing homes.

Beverly has petitioned for review of nineteen of the Board's findings of unfair labor practices and for review of the nationwide posting and cease and desist orders. Torrington Extend–A–Care Employee Association ("Torrington Association") has petitioned for review of the Board's refusal to compel disclosure of certain financial information requested by it in the course of bargaining sessions with Beverly.

Beverly's petition for review of the scope of the nationwide order is granted, and we deny enforcement of that order. Beverly's petition to review nineteen of the Board's individual unfair labor practice findings is

granted as to three findings. Enforcement is granted as to the remaining unfair labor practice findings. Torrington Association's petition for review of the Board's refusal to order disclosure of financial information is denied.

## I. THE CORPORATE–WIDE SCOPE OF THE ORDER

Beverly challenges the Board's order insofar as it directs it to post the usual notice at all of its facilities nationwide and to cease and desist from unfair labor practices at all of those facilities.

Beverly is a nationwide operation that owns and operates 985 nursing homes and has close to 100,000 employees. The Board found that Beverly committed over 130 violations of the Act at 33 homes. At the time of the violations, Beverly divided its operations into five divisions: Eastern, Central, Southern, Western, and Texas. At least one violation was found in each of its operating divisions, although the bulk of the violations occurred in Pennsylvania and Michigan, which were at the pertinent time part of the Eastern Division. Each division was overseen by a divisional headquarters, which typically was staffed by ten to twelve employees, including a "labor relations supervisor" and several "human resources professionals" who assisted individual facilities with employment matters and union campaigns.[1]

Individual facilities typically were managed by an administrator, an assistant administrator, a director of nursing, an assistant director of nursing, and several other lower-level administrators. The facilities were staffed by registered nurses, licensed practical nurses, licensed vocational nurses, nursing assistants, dietary aides, and laundry aides. These latter employees are represented by unions at about 160 of Beverly's facilities.

The NLRB's order commands Beverly to post notices on a nationwide basis and to refrain from unfair labor practices at any of its facilities. Beverly contends that the evidence in this case does not warrant a corporate-wide remedy. We agree.

■ The Board has discretion in fashioning orders so long as they "effectuate the policies of [the Act]." 29 U.S.C. § 160(c); *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964). The Board's orders must be remedial, however, rather than punitive. *Manhattan Eye Ear & Throat Hosp. v. NLRB*, 942 F.2d 151, 156–57 (2d Cir.1991). Relief "must be sufficiently tailored to expunge only the *actual*, and not merely *speculative*, consequences of the unfair labor practices." *Sure–Tan, Inc. v. NLRB*, 467 U.S. 883, 900, 104 S.Ct. 2803, 2813, 81 L.Ed.2d 732 (1984); *Manhattan Eye Ear & Throat Hosp.*, 942 F.2d at 157.

■ A corporate-wide order is properly remedial where either the evidence supports an inference that the employer will commit further unlawful acts at a substantial number of other sites or the record shows that employees at other sites are aware of the unfair labor practices and may be deterred by them from engaging in protected activities. *See NLRB v. S.E. Nichols, Inc.*, 862 F.2d 952, 960–61 (2d Cir.1988), *cert. denied*, 490 U.S. 1108, 109 S.Ct. 3162, 104 L.Ed.2d 1025 (1989). In *S.E. Nichols*, we emphasized the numerous unfair labor practices at one of the company's stores, a fifteen-year history of violations of the Act, the geographic proximity of the stores, transfers of employees between stores, the centralized control over the firm's labor policy by the company's president, and the personal involvement of the company's president and a division-level manager in spreading threats of unfair labor practices. *Id.* at 961. Based on these facts, we concluded that there was substantial evidence of a "conscious corporate-wide policy to coerce company employees in the exercise of their right to join or form labor unions." *Id.* We therefore enforced an order requiring notice at eight stores in upstate New York and Ohio—the area under the supervision of one district supervisor who was behind a number of the unfair labor practices. *Id.* The record in the instant matter does not support a similar order.

---

1. The divisional structure was slightly different prior to 1989.

We turn first to the question of whether the record supports an inference that unlawful acts are reasonably probable at a substantial number of Beverly's nursing homes that are not the subject of unfair labor practice findings. We believe that it does not. Beverly is, to be sure, opposed to the unionization of its employees, but it has the right to take that position. The order in question thus must be justified, if at all, by the nature of Beverly's past conduct.

Although the Board emphasized that Beverly committed over 130 violations at 33 sites, the evidentiary weight of these statistics is substantially diminished when related to the size of Beverly and the types of violations found. At pertinent times, Beverly had nearly 1000 facilities including 160 sites with collective bargaining agreements, and 100,-000 employees. The Board also relied upon the fact that "27 employees at 11 facilities were unlawfully discharged, refused rehire, or removed from their jobs for their activities on behalf of the Union." *Beverly Cal. Corp.*, 310 N.L.R.B. No. 37, slip op. at 19 (Jan. 29, 1993). However, 17 of these employment decisions involved a single incident at a single nursing home, the Fayette Health Care Center. Moreover, Beverly reinstated and gave full backpay to the 17 affected employees in less than four months after the incidents, and the person responsible for the 17 unlawful employment decisions is no longer with Beverly.

The other unfair labor practices were not the kind of hallmark violations found in cases enforcing expanded remedial orders. *Cf. S.E. Nichols,* 862 F.2d at 960–61; *United Steelworkers of Am. v. NLRB,* 646 F.2d 616, 639–40 (D.C.Cir.1981); *J.P. Stevens & Co., Inc. v. NLRB,* 380 F.2d 292, 304 (2d Cir.), cert. denied, 389 U.S. 1005, 88 S.Ct. 564, 19 L.Ed.2d 600 (1967). Moreover, the proof in many cases, while sufficient to support the decision, was ambiguous, and contrary decisions would have been as sustainable. Non-hallmark violations at 3% of a company's facilities does not show an anti-union animus amounting to a proclivity to violate the Act.

Nor was there a showing that the unfair labor practices stemmed from a corporate-wide labor policy. *See S.E. Nichols,* 862

F.2d at 961. The evidence indicated that most employment actions were handled at the facility level and never rose above the division level. In fact, the only evidence the Board cited of a national corporate headquarters' connection to unfair labor practices was the headquarters' participation in ruling on information requests from two unions involving corporate-wide financial information and the participation of Vice–President Ken Sanders in the negotiations at one home.

There was evidence that labor negotiators were transferred among divisions, but only a small percentage of the unfair labor practices were committed by negotiators. Moreover, the types of unfair labor practices committed by Beverly's negotiators—mostly delays or disputes over information requests—are not the types of hallmark violations that evidence a corporate policy of unlawful opposition to union activities. In sum, the only centrally coordinated labor policy shown in this case was Beverly's admitted—and legal—policy of opposing unionization at its facilities. There is thus no basis in the record for concluding that unfair labor practices are reasonably to be expected at a substantial number of other sites.

The Board also relied on the fact that most of the refusals to bargain were committed by labor relations personnel at the divisional level. Although this proposition is true, the conclusion drawn from it ignores several essential facts. First, almost half of those violations seem to have been caused by what amounted to carelessness by one of Beverly's negotiators, Judy Mollinger. Second, there were no hallmark violations of the Act by divisional personnel. The Board dismissed surface bargaining allegations at the three facilities where the bulk of the pertinent unfair labor practices were found, and all three facilities had collective bargaining agreements in place well before the hearing in this case. This fact in particular, stands in marked contrast to other cases, such as *J.P. Stevens* and *United Steelworkers,* where the employer's publicized refusal to enter into bargaining with unions provided much of the basis for the Board's expanded orders. The examples of division personnel condoning flagrant unfair labor practices (most notably

the firing of the "Fayette 17") were isolated and the exception. By and large, the presence of divisional personnel in union campaigns at individual facilities appears to have had a positive effect, and Beverly should not be punished merely because isolated unfair labor practices occurred when division personnel were present. In contrast, in *S.E. Nichols* the company's President personally participated in unfair labor practices and castigated employees who testified before the Board. 862 F.2d at 961.

■ With regard to whether employees at other Beverly sites knew of the unfair labor practices in question and would be chilled by them, there is simply no evidence to support such a conclusion. Beverly operates 985 nursing homes, and nothing in the record suggests that employees at other sites had any knowledge of, much less were chilled by, the unfair labor practices. There was no evidence that Beverly's line employees were transferred from facility to facility, *see id.*, or that other means of communication spread information about such events.

In support of the breadth of its nationwide posting and cease and desist order, the Board relies upon a number of decisions that are easily distinguishable. In *J.P. Stevens Co. v. NLRB*, 380 F.2d at 304, we enforced an order requiring posting and mailing of notices to employees at forty-three of Stevens' plants in North and South Carolina when flagrant unfair labor practices were found at each of the twenty plants in that region at which union campaigns were started. In doing so, however, we stressed that the plants were in close geographic proximity, that the company's labor policies were centrally determined, and that the company's practices were publicized in a way that warranted the conclusion that they affected employees at other plants. *Id.*

In *United Aircraft Corp. v. NLRB*, 440 F.2d 85, 100 (2d Cir.1971), we enforced a Board order requiring the posting of notices at United Aircraft's six Connecticut plants when violations occurred at five of them. We noted the company's demonstrated anti-union animus and practices, and the proximity of the plants in question as reasons justifying the order. *Id.* In *NLRB v. Jack La Lanne*

*Management Corp.*, 539 F.2d 292, 293 (2d Cir.1976), we enforced an order requiring the posting of notices at all of the company's ten New York City health spas after flagrant unfair labor practices were found at one of the facilities. However, the company's violations were repetitive in nature, and the affected workers were freely transferred among the New York City facilities. *Id.* at 295. Finally, in *United Steelworkers*, 646 F.2d at 640–41, an announced, prolonged and well-publicized campaign of unlawful union resistance at geographically proximate sites supported a broad order.

## II. DISCLOSURE OF FINANCIAL INFORMATION

Torrington Association is the employees' bargaining representative at Torrington Extend–A–Care Centre, a Beverly nursing home in Connecticut. Faced with the impending expiration of their current collective bargaining agreement, Torrington Association and Beverly held a series of negotiating sessions in June 1988. At the first meeting, Beverly's negotiator, George Ulrich, began the discussion by giving a half-hour presentation stressing Beverly's financial condition. Ulrich emphasized that employees were being laid off, that the price of Beverly's stock had gone down, and that virtually all of Beverly's nursing homes were "on the block." Ulrich supplemented his presentation with a series of newspaper articles and press releases on Beverly's financial difficulties. At the close of his presentation, Ulrich proposed a wage freeze.

The articles Ulrich distributed almost without exception stressed that Beverly's financial difficulties were not so severe as to lead to insolvency. Likewise, Ulrich maintained that Beverly "was not going under, but was having trouble staying afloat." During his presentation, Ulrich was at pains to avoid stating that Beverly was unable to pay its employees a requested pay increase. In fact, when the union's negotiator specifically asked for financial information, Ulrich responded that he did not think the union was entitled to it because the company was not claiming an inability to pay.

In response to Ulrich's presentation, the union orally requested information on the state reimbursement rate and on the use of "pool nurses," non-unit temporary help, at the Torrington home. Chris Smith, a Beverly employee who attended the bargaining sessions but did not have authority to bind Beverly, supplied the reimbursement rate and promised the information on the pool nurses.

Several days later, the union's negotiator, Ruth Pulda, told Ulrich that the union would be seeking more financial information. Ulrich replied that he believed Beverly had no duty to disclose such information because the company was not asserting an inability to pay. The union confirmed its request in writing in a letter dated June 9, 1988. The union requested: (1) all of Beverly's SEC filings since October 1985 concerning Beverly's financial status, (2) all monthly cash flow, income and balance sheet statements from October 1985 to the present for Beverly, the Torrington facility, and for the eight other Beverly homes in Connecticut, and (3) the amount the Torrington home spends monthly on pool nurses. Beverly did not supply the information and Torrington filed unfair labor practice charges.

The ALJ concluded that Beverly had violated Section 8(a)(5) and (1) of the Act, reasoning that Beverly was "pleading the functional equivalent of an inability to pay." The ALJ did not order disclosure, however, because the parties had already reached agreement on a new contract. The Board reversed the ALJ in part. Relying on its recent decision in *Nielsen Lithographing Co.*, 305 N.L.R.B. No. 90 (Nov. 22, 1991), the Board reasoned that because Ulrich never stated that Beverly would be unable to pay the requested wage increase during the term of the next contract, the union was not entitled to the requested financial information. The Board, however, did find that Beverly violated Section 8(a)(5) and (1) by not providing the requested information on the pool nurses. Torrington Association petitions for review of the Board's decision not to order disclosure of the rest of the requested information.

Section 8(a)(5) and (d) of the Act require an employer to bargain in good faith with its employees' representative. 29 U.S.C. § 158(a)(5), (d) (1988). Providing unions with relevant information has been held to be one element of the duty to bargain in good faith. *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 303, 99 S.Ct. 1123, 1125, 59 L.Ed.2d 333 (1979); *Olivetti Office U.S.A., Inc. v. NLRB*, 926 F.2d 181, 188 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 168, 116 L.Ed.2d 132 (1991). Information concerning the terms and conditions of employment is presumed relevant. *Ohio Power Co.*, 216 N.L.R.B. 987 (1975), *enf'd*, 531 F.2d 1381 (6th Cir.1976). When a union requests access to a company's financial information in the course of bargaining, however, no such presumption applies.

In *NLRB v. Truitt Mfg. Co.*, 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956), the Supreme Court addressed the question of what obligation an employer has to disclose financial information to its union when it relies on its poor financial condition in bargaining sessions. In *Truitt*, the employer claimed that any wage increase beyond 2½ cents an hour would put it out of business but refused to substantiate the claim. *Id.* at 150, 76 S.Ct. at 754. The Court held that a "refusal to attempt to substantiate a claim of inability to pay increased wages may support a finding of a failure to bargain in good faith." *Id.* at 153, 76 S.Ct. at 756. The Court stressed, however, that the union's right to disclosure in inability-to-pay cases was not automatic: "Each case must turn upon its particular facts. The inquiry must always be whether or not under the circumstances of the particular case the statutory obligation to bargain in good faith has been met." *Id.* at 153–54, 76 S.Ct. at 756 (footnote omitted).

After *Truitt*, a few courts distinguished between cases in which an employer claimed an inability to pay the requested wage increase and those in which the employer merely asserted that complying with the union's request would place it at a competitive disadvantage, ordering disclosure in the former but denying it in the latter. *See NLRB v. Harvstone Mfg. Corp.*, 785 F.2d 570, 575–

76 (7th Cir.), *cert. denied,* 479 U.S. 821, 107 S.Ct. 88, 93 L.Ed.2d 41 (1986); *Washington Materials, Inc. v. NLRB,* 803 F.2d 1333, 1338–39 (4th Cir.1986). Other courts read *Truitt* to mandate disclosure whenever the employer claimed financial hardship. *See NLRB v. Western Wirebound Box Co.,* 356 F.2d 88, 91 (9th Cir.1966). We adopted the latter, broader reading of *Truitt. Olivetti Office U.S.A.,* 926 F.2d at 188–89; *NLRB v. General Elec. Co.,* 418 F.2d 736, 750 (2d Cir.1969), *cert. denied,* 397 U.S. 965, 90 S.Ct. 995, 25 L.Ed.2d 257 (1970). The majority of Board decisions after *Truitt* also mandated disclosure when the employer asserted any form of financial hardship. *See, e.g., Sioux City Stockyards,* 293 N.L.R.B. 1 (1989), *enf'd,* 901 F.2d 669 (8th Cir.1990). *But see Washington Materials, Inc.,* 276 N.L.R.B. 839 (1985) (recognizing the distinction between inability-to-pay and competitive disadvantage claims).

Recently, however, the Board has altered its reading of *Truitt.*[2] Prompted by the Seventh Circuit's refusal to enforce its decision in *Nielsen Lithographing Co. v. NLRB,* 854 F.2d 1063 (7th Cir.1988), the Board on remand decided that it would thereafter distinguish between those employers who claim a present or prospective inability to pay during the period of the contract under negotiation and those employers who claim only economic difficulties or a desire for a greater profitability. *Nielsen Lithographing Co.,* 305 N.L.R.B. No. 90, *aff'd. sub nom Graphic Communications Int'l Union, Local 508 v. NLRB,* 977 F.2d 1168 (7th Cir.1992). According to the Board, "the employer who claims only economic difficulties or business losses or the prospect of layoffs is simply saying that it does not *want* to pay." *Id.* The Board qualified this assertion by noting that the circumstances of an individual case might support a conclusion that particular claims of economic problems amounted to an assertion of an inability to pay during the contract under negotiation. *Id.*

When an agency has committed itself to a settled course of behavior, a presumption in favor of that course arises. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.,* 463 U.S. 29, 41–42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983); *Atchison, Topeka & Santa Fe Ry. v. Wichita Board of Trade,* 412 U.S. 800, 807, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350 (1973); *New York Council, Ass'n of Civ. Technicians v. FLRA,* 757 F.2d 502, 508 (2d Cir.), *cert. denied,* 474 U.S. 846, 106 S.Ct. 137, 88 L.Ed.2d 113 (1985). Torrington Association argues that the Board's decision in the instant matter was at odds with the Board's "settled course of behavior" of treating claims of economic difficulties as requiring substantiation. However, an agency may alter its interpretation of a statute so long as the new rule is consistent with the statute, applies to all litigants, and is supported by a "reasoned analysis." *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 42, 103 S.Ct. at 2866; *New York Council, Ass'n of Civ. Technicians,* 757 F.2d at 508; *NLRB v. Niagara Mach. & Tool Works,* 746 F.2d 143, 148 (2d Cir.1984). Such a new rule must be upheld by the courts "regardless of how we might have decided the matter in the first instance [if the Board] ... has arrived at one reasonable resolution of the problem in a reasonable manner." *Niagara Mach. & Tool Works,* 746 F.2d at 149 (quoting *Local 900, Int'l Union of Elec., Radio & Mach. Workers v. NLRB,* 727 F.2d 1184, 1189 (D.C.Cir. 1984)).

The Board's decision in *Nielsen Lithographing* meets these requirements. First, the new approach is consistent with the Act. The duty to provide relevant information is based on the general requirement to "confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement" in Section 8(d) and (a)(5) of the Act. The *Nielsen Lithographing* rule certainly does not

---

**2.** Torrington Association argues that the Board has not altered its practice regarding disclosure of financial information. However, we agree with the Seventh and District of Columbia Circuits that the Board's decision in *Nielsen Lithographing* alters the Board's approach to this issue. *See United Steelworkers of Am., Local 14534 v. NLRB,* 983 F.2d 240, 244–45 (D.C.Cir.1993); *Graphic Communications Int'l Union, Local 508 v. NLRB,* 977 F.2d 1168, 1169 (7th Cir.1992) (the Board "reexamined its position from the ground up ... and ... adopted [the Seventh Circuit's approach] as the Board's position").

exceed any parameters expressly delineated in the statute. Second, there is no claim that the Board has not applied its new rule equally to all litigants.

Finally, the Board provided the "reasoned analysis" necessary to sustain its change in practice. Although the reasoning of the majority decision in *Nielsen Lithographing* is somewhat sparse, the opinion does signal its approval of the Seventh Circuit's decision in *Harvstone*, suggests that the new rule is a better reading of *Truitt*, and argues that there is a difference between actual inability to pay claims and claims that are based on an employer's desired level of financial return. In the former case, according to the majority, financial records are relevant; in the latter case, they are not. Although the opinion may not be as reasoned as we might wish and is a reading of *Truitt* that we do not entirely share, we must "'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. at 2867 (quoting *Bowman Transp. Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974)). Here, the agency's reconsideration of what *Truitt* requires can be fairly discerned.

■ Torrington Association also argues that it has a right to the financial information because the current collective bargaining agreement has an interest arbitration clause. Although an employer's general duty to provide relevant information extends to information the union needs in arbitration, *Chesapeake & Potomac Tel. Co. v. NLRB*, 687 F.2d 633, 635 (2d Cir.1982), neither that case, nor any other, holds that a union has a *per se* right to financial information because wage disputes may be submitted to interest arbitration. We believe that there should not be a general rule compelling disclosure in such circumstances. An arbitrator might or might not regard such information as relevant, and a *per se* rule might deter employers from agreeing to interest arbitration. However, an arbitrator who desires such information can take steps to obtain it or at least draw appropriate inferences from its absence.

## III. OTHER UNFAIR LABOR PRACTICE FINDINGS

The Board concluded that Beverly had committed over 130 violations of Section 8(a)(1), (3), and (5) of the Act at 33 sites. Beverly has petitioned for review of 19 of these findings and conclusions. The General Counsel has cross-petitioned for enforcement of the Board's unfair labor practice findings and conclusions.

■ Beverly does not contest the majority of the Board's unfair labor practice findings and conclusions, and the Board is entitled to summary affirmance of those findings and conclusions. *NLRB v. Vanguard Tours, Inc.*, 981 F.2d 62, 67–68 (2d Cir.1992).

Beverly does contest nineteen of the Board's findings of unfair labor practices. It is against the background of acknowledged violations that we consider those findings. *NLRB v. Pace Motor Lines, Inc.*, 703 F.2d 28, 29 (2d Cir.1983) (per curiam); *NLRB v. Clark Manor Nursing Home Corp.*, 671 F.2d 657, 660 (1st Cir.1982). We deny enforcement as to three unfair labor practice findings and grant enforcement as to the rest.

The Board's findings of fact must be supported by "substantial evidence" on the record as a whole. 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951); *Abbey's Transp. Services, Inc. v. NLRB*, 837 F.2d 575, 579 (2d Cir.1988). A reviewing court may not "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.*" *Universal Camera Corp.*, 340 U.S. at 488, 71 S.Ct. at 465. Nonetheless, substantial evidence must be "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 477, 71 S.Ct. at 459 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). We turn now to the contested findings.

### 1. Mount Lebanon Manor Convalescent Center

The Board concluded that Beverly violated Section 8(a)(3) and (1) of the Act by denying

Diane Mead, an employee at Beverly's Mount Lebanon Manor Convalescent Center, a tuition reimbursement. This conclusion is not supported by the evidence.

 Firing or otherwise adversely affecting an employee's employment on account of that employee's union activities violates Section 8(a)(3) and (1) of the Act. In unlawful discharge and other adverse employment action cases, the determinative issue is the employer's motivation. *Abbey's Transp. Services, Inc.*, 837 F.2d at 579. The General Counsel must first persuade the Board that anti-union animus contributed to the employer's decision. *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 395, 103 S.Ct. 2469, 2471, 76 L.Ed.2d 667 (1983) (describing the Board's decision in *Wright Line*, 251 N.L.R.B. 1083 (1980), enf'd, 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982)). If the General Counsel establishes a prima facie case, the burden shifts to the employer to demonstrate by a preponderance of the evidence that the same employment action would have been taken in the absence of the protected conduct. *NLRB v. Transportation Management Corp.*, 462 U.S. at 395, 103 S.Ct. at 2471.

Beverly's Mount Lebanon facility had a tuition reimbursement program under which full-time employees could receive 75% of their tuition and book expenses up to $750 each year to defray the costs of their work-related classes. For purposes of the reimbursement program, the year ran from the date of employment. Diane Mead was a part-time nursing assistant at the Mount Lebanon facility. When Mead complained about her raise in August 1986, then-facility-administrator Harry Slacum told her that she should apply to the tuition reimbursement program despite the fact that she was only a part-time employee. Mead did so and was subsequently reimbursed about $130 for a course she had taken that summer and $750 for classes she enrolled in for the upcoming fall semester. Slacum apparently allowed Mead to receive the tuition reimbursement despite her part-time status by interceding with a letter on her behalf to Divisional Vice–President George Putnam. Be-

cause Mead started work on July 1, 1985, the $130 reimbursement fell within her first year of employment and the $750 reimbursement fell within her second.

From November 1986 to January 1987, Mead openly participated in an unsuccessful union campaign at the facility. Mount Lebanon administrators knew that Mead was pro-union. In January 1987, Mead submitted a tuition reimbursement request for classes she planned to take in the spring semester. Her request was denied.

 Under the Board's *Wright Line* test, the General Counsel must first demonstrate that protected conduct contributed to the employer's actions. The employer's knowledge of Mead's union activities and other instances of unfair labor practices at the facility permit the inference of unlawful motivation, although, by Mead's own admission, the employer continued to award tuition reimbursements to other vocal union supporters.

Under *Wright Line*, however, the employer is not liable so long as it can demonstrate by a preponderance of the evidence that the adverse employment action would have occurred even in the absence of the unlawful motivation. Here, overwhelming evidence supports the conclusion that Mead would not have been reimbursed for her last tuition request.

Under company rules, Mead was not entitled to the tuition reimbursement on grounds other than her part-time employment. Employees were entitled only to be reimbursed up to $750 per year. When Mead filed the contested January 1987 request, she was in the middle of her second annual period (July 1, 1986—July 1, 1987). However, she had already been reimbursed $750 for her tuition and books for the fall semester pursuant to her request in August 1986. Therefore, Mead had already received her yearly allowance of reimbursement. In addition, the letter from Slacum to Putnam recommending approval of Mead's tuition request suggests that the offer was for one time only.

The Board nonetheless concluded that Beverly violated the Act when Mead's tuition assistance was "withdrawn." Even if the

union had established that Slacum's offer of tuition reimbursement was meant to be ongoing, even Mead does not contend that Slacum had offered to waive the $750 yearly cap for her benefit. The Board in essence found that Beverly withdrew a non-existent benefit. Accordingly, the Board's conclusion cannot stand.

2. Provincial House Total Living Center

█ The Board found that Beverly violated Section 8(a)(3) and (1) of the Act by discharging nurse's aide Linda Johnson. The Board's finding that union activity contributed to Johnson's discharge is not supported by substantial evidence.

The Board acknowledged that Johnson's discipline record was "bad." Between May 1985 and June 1986, Johnson received six written warnings and one oral warning. The warnings covered such offenses as excessive absenteeism, excessive tardiness, loitering, and disrespect to superiors. Her last warning in June 1986 explicitly stated that her next violation would result in her dismissal. In November 1986, Johnson received another written warning from her supervising nurse, Ann Williams, this time for failing to shave two patients. In response to receiving this warning, Johnson both orally and on the employee comment section of the facility's written warning form attributed the discipline to Williams' singling her out on account of her race. Johnson claimed that later that day she learned from Pauline Bailey, a fellow employee who discovered the shaving violations, that Williams had asked Bailey to check only on Johnson's patients. Johnson related this claim to facility administrator Sonja Scarf later that day as part of her claim that Williams was prejudiced. When Williams and Bailey denied that Williams ever told Bailey this, and Bailey also denied telling Johnson that Williams had said this, Johnson was fired for making a false statement about a fellow employee.

Johnson had participated in an unsuccessful union campaign at the Provincial facility from around May to August 1986. In addition, Johnson's signature on an open letter to all employees at the facility and the testimony of her husband strongly suggest that Bev-

erly knew of Johnson's pro-union stance. On this evidence, the Board held that Johnson's dismissal was in violation of Section 8(a)(3), emphasizing that the facility administrators "leaped" to the conclusion that Johnson had lied and maintaining that other employees discharged or punished for making false statements had presented more serious cases.

There is not substantial evidence to support the Board's finding that an improper motive contributed to Johnson's discharge. Evidence of anti-union animus at the facility was extremely weak. The Board found no unfair labor practices in connection with the union campaign at Provincial. The only unfair labor practice found at the facility was a later de minimis Section 8(a)(3) violation based on a failure to allow a special exemption from the working hours for a union supporter. In addition, Johnson admitted that none of her superiors had said anything to her about her union activities. Beverly also introduced evidence that other employees had been given written warnings and fired for making false statements.

Johnson's own words belie the Board's finding that anti-union animus motivated Johnson's discharge. Johnson stridently maintained both orally at the time she was reprimanded and on her discipline form that she was being singled out on account of race, not because of her union activities. The only mention of the union throughout the series of reprimands and meetings that preceded Johnson's discharge was on her written warning, where after making a lengthy complaint about Williams' alleged race discrimination, she added "and also she picks on me because of the Union." In fact, the Board itself seemed to believe that Johnson's statement accusing Williams of singling her out was false but speculated that this mistake was made in good faith by Johnson and then faulted the employer for not recognizing that Johnson could have been making a good faith mistake.

Even if anti-union animus contributed to Johnson's firing, Beverly also proved its affirmative defense under *Wright Line* that she would have been fired anyway. The Board apparently felt that Beverly should

have realized that Johnson was making a good faith mistake (if in fact she was), and therefore should have chosen not to fire her. The Board's reasoning, however, ignores Johnson's lengthy disciplinary record, as well as the substantial disruption her concededly false accusations created in the workplace. We do not think that the Act allows second-guessing of an employer's decision to fire an employee with an extensive disciplinary record who seeks to avoid the consequences of her latest dereliction by groundlessly accusing her supervisor of racial prejudice.

### 3. Fayette Health Care Center

It is an unfair labor practice under Section 8(a)(5) and (d) of the Act for an employer to fail to bargain in good faith with the employees' representative. The Board in this case found that Beverly's negotiators' lateness in arriving at the initial bargaining session with the employees' representative from Fayette Health Care Center was an "act of extraordinary discourtesy [that] rises to the level of an unfair labor practice in violation of section 8(a)(5)...." Beverly's representatives arrived at 7:20 P.M. for a 3:30 P.M. meeting. According to the Board, Beverly violated the Act "by being late and deliberately not notifying the Union that it would be late."

▆▆▆▆ Although extreme tardiness in conjunction with other conduct may amount to a failure to bargain in good faith, *see generally Continental Ins. Co. v. NLRB*, 495 F.2d 44, 48 (2d Cir.1974), an essential factual premise of the ALJ's conclusion on this point is not supported by substantial evidence. The Board explicitly relied on the fact that Beverly's negotiator, Judy Mollinger, "deliberately" did not notify the union that she would be late. However, the union's negotiator, Tom DeBruin, admitted that Mollinger had told him that she might be late because of her travel plans. Mollinger also testified that she called DeBruin's office on the day of the meeting to tell him that she would not be arriving until around 7:00 P.M. DeBruin acknowledged that the day after the negotiating session he discovered that Mollinger had left such a message at his office. DeBruin also admitted that he had not told his office where he would be so that they could relay messages to him and that he could not reach his office after 5:00 P.M.

Given the uncontradicted evidence that Mollinger did in fact leave a message for DeBruin stating that she would be late, the Board's essential finding that Mollinger "deliberately" failed to notify the union of that fact is not supported by substantial evidence.

### 4. Beverly Manor of Monroeville

The Board found a violation of Section 8(a)(1) and (5) based on unilateral changes in vacation, medical insurance and absenteeism policies following the union's victory. We agree.

▆▆▆▆ The Board found that Beverly violated the Act by unilaterally adding to all its medical plans "MedView," a private screening company that employees have to consult before having elective surgery or staying in the hospital more than twenty-four hours. Beverly defends its action on the grounds that its insurance carrier made it change the plans. However, Beverly points to nothing in the record to support this assertion. Beverly, citing *Connecticut Light & Power Co. v. NLRB*, 476 F.2d 1079, 1082 (2d Cir.1973), also defends its action on the grounds that the adoption of MedView did not "vitally affect" the terms and conditions of employment. The Board's contrary conclusion, however, was certainly permissible. Beverly also contests the Board's finding on the grounds that the Board made this finding only because it misread the ALJ's decision as having done so. Beverly, however, has waived this argument by not mentioning it until their reply brief. *See Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir.1993).

Beverly does not contest that a new absenteeism policy was adopted right after the election and that the changes were substantial enough to support the Board's finding that they "vitally affected" the terms and conditions of employment.

Beverly also claims that no new vacation policy was implemented. Beverly argues that Office Manager Cathy Eaton merely mistakenly explained the old vacation policy in an employee meeting held to clarify the vacation rules and did not announce a new

policy. However, Eaton's explanation for why she held the meeting was implausible, and Beverly has introduced no evidence that Eaton or other managers in any way attempted to correct the "mistake." There is thus substantial evidence to support the Board's determination.

### 5. Fayette Health Care Center

The Board found that Fayette administrator Jim Filippone assaulted employee Wilma Franks and union representative Ashley Adams during grievance meetings in violation of Section 8(a)(1) and (5) of the Act. Whether the assaults occurred were essentially credibility disputes, and there was substantial evidence to support the Board's decision in both cases.

■ Beverly also challenges the Board's findings on the grounds that Filippone was found not guilty of assaulting Franks and Adams in a state court criminal trial. However, Beverly's attempt to invoke the doctrine of collateral estoppel must fail. The state court acquittal of Filippone is not binding on the Board because of the difference in the degree of the burden of proof in criminal and civil trials. *See Neaderland v. C.I.R.*, 424 F.2d 639, 640–43 (2d Cir.), *cert. denied*, 400 U.S. 827, 91 S.Ct. 53, 27 L.Ed.2d 56 (1970).

### 6. Carpenter Care Center

The Board found that Beverly committed violations of Section 8(a)(3) and (1) of the Act by adverse employment actions against three employees at the Carpenter facility. We agree.

■ The Board found that Beverly's suspension of employee Marie Meador, ostensibly for arguing loudly with a nurse's aide, was in retaliation for her union activities. Beverly challenges the finding, emphasizing the wrongdoing that led to the suspension. The Board, however, while acknowledging that Meador had violated workplace rules, inferred from substantial circumstantial evidence that the severity of Meador's punishment was attributable to her union activities. Beverly has offered nothing beyond its own inferences to rebut the finding that Meador's

discipline was related to her union activities. We thus have no grounds on which to conclude that the Board's determination was not supported by substantial evidence.

■ The Board found that Beverly fired employee Erika Evans and issued a written warning to employee Lynn Smith because of their union activities. Beverly defends these actions as taken solely as a result of Evans's "grossly insubordinate" act in "mooning" a superior, and Smith's "failure to comprehend the seriousness of the misconduct" by laughing at the incident. The Board, however, found that Evans's "'mooning' was partial and over in an instant" and furthermore came in response to Evans's and Smith's mistaken but sincere belief that their supervisor had just playfully challenged Evans to "bare it, baby." The Board was faced with conflicting testimony as to what happened and how it was perceived. The Board was thus free to accept one party's characterization of the incident. Given the equivocal nature of the evidence, we conclude that there was substantial evidence to support the Board's interpretation of the events.

### 7. Duke Convalescent Center

■ The Board found that Beverly violated Section 8(a)(3) and (1) of the Act by firing union supporter Lucille Lucas. Beverly challenges the Board's finding on the grounds that Lucas had committed sufficient disciplinary violations under the facility's progressive discipline policy to warrant her discharge. The Board's finding that there was an improper motivation, however, was supported by substantial evidence. Although the company's policy allowed them to fire Lucas for this conduct, its practice at this facility was not to resort to discharge in analogous cases. Lucas's union ties were minimal, but the ALJ credited testimony that the facility's managers were looking to fire employees who even talked to the union.

### 8. Meyersdale Manor

■ The Board found that Beverly violated Section 8(a)(3) and (1) of the Act by firing employee Suzanne LaFramboise at the Meyersdale Manor facility. Beverly argues that

there were lawful reasons for LaFramboise's discharge. As in the discharge cases above, however, Beverly has introduced no evidence that other employees who engaged in similar conduct were also fired. Accordingly, there was substantial evidence to support the Board's finding that Beverly failed to establish its affirmative defense under *Wright Line*.

### 9. Stenton Hall Nursing and Convalescent Center

The Board found that Beverly committed two separate violations of Section 8(a)(5) and (1) of the Act by unilaterally restricting the activities of union delegates and by refusing to execute a collective bargaining agreement reached with the facility's union.

■ Beverly contests the Board's finding that it unilaterally changed the terms of employment by advising the union in a memo that union delegates would be permitted to discuss union activities with employees only during non-work time and in non-work areas. Beverly protests that this memo did not constitute a change because an "equally plausible" interpretation of the existing contract between the union and the facility authorized this action. Beverly's interpretation of the contract is not "equally plausible," however. Beverly's memo transgressed the limitations allowed by the contract by banning the union delegates from discussing business with other employees during work time and on the premises in a way that did not interfere with the operations of the employer.

■ Beverly's objections to the Board's finding that Beverly unlawfully refused to execute the collective bargaining agreement are also meritless. While there is evidence that Beverly's negotiator had a mistaken impression of what the contract terms were, it is undisputed that the contract itself was unambiguous, and there is no claim that the union should have known that Beverly was making a mistake. Because enforcement of the order will not "be oppressive or result in hardship or an unequal exchange," *see Freight, Constr., Gen. Drivers, Warehousemen and Helpers Local 287*, 272 N.L.R.B. 348 (1984), Beverly must bear the burden of its unilateral mistake.

### 10. North Park Manor and Greene Health Care Center

The Board found that Beverly violated Section 8(a)(3) and (1) of the Act by firing employee Geraldine Bubna at North Park Manor and Section 8(a)(5) and (1) of the Act by failing to bargain with the union over the effects of the sale of these two facilities.

■ As to Bubna, Beverly does not contest that the General Counsel established a prima facie case under *Wright Line* but argues that Bubna's discharge was authorized under the facility's strict absenteeism policy. Beverly stresses that many other employees were either disciplined or fired for violations of this policy but offered no evidence that the other employees it fired for absenteeism pursuant to the policy had the legitimate excuses that Bubna had. Accordingly, there is substantial evidence supporting the Board's finding.

Beverly disputes the finding that Beverly failed to engage in effects bargaining over the sale of these two facilities. However, there is substantial evidence that Beverly's negotiator avoided the union during September, as she had been instructed to do, when the union sought effects bargaining.

### 11. Sherman Oaks Care Center

■ The Board found that Beverly violated Section 8(a)(5) and (1) of the Act by failing to provide the union with a copy of Beverly's "Infection Control Manual." Beverly protests that its delay was caused only by reasonable concerns about securing guarantees from the union to insure the document's confidentiality. However, Beverly did not suggest it had confidentiality concerns until five months and several meetings after the union requested the information. Moreover, when Beverly finally gave the union the information, it did not insist on any definite commitment by the union to keep the information confidential. Therefore, there is substantial evidence to support the Board's finding that Beverly unreasonably delayed producing the manual.

**12. Ridgeview Manor Nursing Home**

The Board found that Beverly violated Section 8(a)(3) and (1) of the Act by failing to reinstate employee Charisse Bryant, and by firing employee Shirley Niswonger.

■ Beverly challenges the Board's finding that it violated Section 8(a)(3) and (1) by failing to reinstate Bryant after she returned from a personal leave of absence. Beverly claims that the Board lacked a legitimate basis in the record to infer that unlawful anti-union animus motivated this action. The Board, however, legitimately relied on circumstantial evidence to establish Beverly's knowledge of Bryant's union activities. *See Abbey's Transp. Services,* 837 F.2d at 579. Contrary to Beverly's argument, the Board did not rely on protected expression to infer anti-union animus as forbidden in *Holo–Krome Co. v. NLRB,* 907 F.2d 1343, 1344–47 (2d Cir.1990). The Board merely considered Beverly's anti-union efforts to infer knowledge of Bryant's pro-union stance. There is thus substantial evidence to support the Board's finding.

■ Beverly contests the Board's finding that it unlawfully discharged employee Shirley Niswonger because of union activities on the grounds that the evidence did not establish that Beverly acted out of unlawful anti-union animus and that Beverly had a legitimate reason to fire Niswonger.

First, Beverly stresses that over five months had passed since Niswonger's last union activity. Although this is true, there remains ample reason to infer unlawful motivation despite the time lapse. Niswonger's last union activity was participation in a failed union election campaign. Since the union had lost elections two years in a row and Beverly acknowledged that it knew Niswonger was the employee who initiated union campaigns each of these years, there is substantial evidence to support the Board's finding that Beverly acted out of unlawful anti-union animus. Likewise, Beverly's claim that Niswonger would have been fired for her conduct absent her union affiliation is unconvincing.

**13. Parkview Gardens Care Center**

■ The Board found that Beverly violated Section 8(a)(5) and (1) of the Act by implementing a vacation buy-out policy following an impasse in contract negotiations. Beverly claims that the new policy was "reasonably comprehended" within its earlier offer to the union. Beverly admits, however, that the implemented policy contained a different buy-out date than the earlier offer. The Board reasonably found that the one-month delay in the payment date was a substantially different term than the buy-out date contained in its earlier proposal.

## CONCLUSION

We therefore enforce those portions of the Board's order that remedy the uncontested violations. As to sixteen of the nineteen contested unfair labor practice findings, we grant enforcement. As to the other three contested unfair labor practices, we deny enforcement. We also deny Torrington Association's petition for review of the Board's finding that Beverly did not commit an unfair labor practice by not turning over financial information to Torrington Association. We deny enforcement of the order insofar as it directs nationwide cease and desist and posting relief.