STROEHMANN BAKERIES, INC.,
Petitioner–Cross–Respondent,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent–Cross–
Petitioner.

Nos. 1429, 1887, Dockets 95–
4159(L), 95–4207(XAP).

United States Court of Appeals,
Second Circuit.

Argued May 20, 1996.

Decided Sept. 9, 1996.

Steven R. Wall, Morgan, Lewis & Bockius, Philadelphia, PA (Edward S. Mazurek, of counsel), for Petitioner–Cross–Respondent.

David A. Fleischer, Staff Attorney, National Labor Relations Board, Washington, DC (Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, of counsel), for Respondent–Cross–Petitioner.

Before: KEARSE, WINTER and CALABRESI, Circuit Judges.

WINTER, Circuit Judge:

Before us are cross-petitions for review and enforcement of an order of the National Labor Relations Board holding that Stroehmann Bakeries, Inc. ("Stroehmann" or "Company") committed unfair labor practices in violation of Sections 8(a)(1) & (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (5). Specifically, the Board held that Stroehmann unlawfully: (i) refused to provide Local 116 of the Bakery, Confectionery, and Tobacco Workers' Union ("Local 116" or the "Union") with information regarding the company's financial operations; (ii) unilaterally eliminated the shipping division of its Syracuse, New York facility; and (iii) solicited employees to decertify the Union. The Board's order requires that Stroehmann post notices of its violations in the Syracuse depot; reopen the shipping division of the Syracuse depot and reinstate all former employees; furnish Local 116 with the information previously requested; and cease and desist from engaging in any unfair labor practices. We hold that Stroehmann acted

lawfully in declining to provide the information requested but unlawfully solicited employees to decertify the Union. We therefore grant the cross-petitions in part and deny in part, altering the remedies accordingly.

## BACKGROUND

Stroehmann, a manufacturer and distributor of bakery products, is a wholly-owned subsidiary of Weston Foods, a subsidiary of George Weston Limited, a Canadian conglomerate. It does business in New York and Pennsylvania. Prior to February 11, 1994, all baked goods destined for upstate New York were loaded in bulk by product type, e.g., white bread. They were then shipped from Stroehmann's bakery in Sayre, Pennsylvania to a distribution center in Syracuse. The Syracuse depot unloaded the products and reloaded them according to destination in the Syracuse area and other upstate locations.

At the Syracuse depot, Teamsters Local 182 represented the route salesmen, transport drivers, and mechanics. Local 116 represented the "shippers." Local 116's bargaining unit consisted of eight full-time shippers, one part-time shipper, and one sanitor. The shippers' responsibilities included unloading baskets of bulk product from incoming tractor-trailers. When the goods were unloaded, local delivery drivers re-loaded baskets bound for local Syracuse destinations onto their respective route trucks, while the shippers re-loaded baskets destined for other areas in upstate New York. When the drivers returned from delivering the baked goods, shippers loaded the empty baskets onto a transport truck for return to the bakery in Pennsylvania. The sanitor performed cleaning duties at the Syracuse facility.

### A. *Elimination of the Shipping Unit*

The collective bargaining agreement between Local 116 and Stroehmann expired in November, 1993. Prior to the expiration of the agreement, the Union notified the Company of its desire to negotiate a new contract. On November 16 the parties met in their only negotiating session. At the meet-

ing, Kenneth Spehalski, Stroehmann's director of industrial relations, began by relaying what he described as "bad news." He said that the Company had lost $12 million in 1992, and was projected to lose $16–20 million in 1993. Spehalski quoted from the conglomerate's annual report, which described the bakery operation's losses as "disastrous" for "profitability." Spehalski indicated that without a parent company willing to fund its losses Stroehmann would go out of business. However, he noted that Weston intended to maintain a foothold in the American baking industry and was therefore willing to bail Stroehmann out financially. Spehalski expressly denied that he was claiming an inability to pay and admitted that the conglomerate's "deep pockets" were more than sufficient to pay for the Syracuse operation. Spehalski emphasized, however, the need for Stroehmann to become a more efficient operation and pointed out the redundancy of "double handling," i.e., unloading and reloading at Syracuse, as an example of wasteful practices. Spehalski then announced that Stroehmann wanted to eliminate the Syracuse shipping unit altogether and have the loading performed directly at the Pennsylvania bakery.

After the Union representative inquired as to whether there was anything the Union could do to save jobs, Spehalski responded that perhaps three or four employees could stay on to service the Syracuse local routes, so long as the Union was willing to make certain concessions. With regard to the sanitor, the Company took the position that because it could contract out for cleaning and maintenance work at half the price of paying the sanitor, the sanitor's pay should be reduced. Company representatives explained that Stroehmann required a savings of approximately $150,000 annually in order to remain competitive.

Shortly after the November 16 negotiating session, Stroehmann submitted a formal contract proposal to the Union. Under the proposal, the bargaining unit was to be reduced to one part-time and three full-time positions that would service only local routes in Syracuse. The Company also proposed a follow-up negotiating session. The Union did not

respond to these proposals, saying it needed more time to consider the terms. On December 6, 1993, after several attempts to bring the Union to the bargaining table, Spehalski wrote to the Union proposing further negotiations and stating that "the Company's willingness to bargain expires on February 1, 1994."

On December 10, Company President Jim Fisher asserted in a letter to all employees that as a result of operating losses sustained by the Company in 1992 and 1993 the Company "*cannot* continue to operate as we have in the past. We simply *cannot* afford it." (emphasis added). That same day, the Union submitted an extensive request for financial information, which it asserted was "relevant and necessary to assess [the Company's] claim of financial hardship and inability to pay." The Union requested, *inter alia:* (i) the names of all companies that Stroehmann considered to be primary competitors; (ii) "all production or other management reports" from the preceding three years; (iii) any list of customers and sales accounts, accounts payable journals, supplier invoices, general ledgers, charts, and computer generated reports; (iv) the names, titles, and compensation of all employees, including non-bargaining unit employees and management personnel; (v) all annual or quarterly reports produced by the company over the previous three years; (vi) all filings with the New York Secretary of State; and (vii) all applications for loans, lines of credit, mortgages or other forms of borrowing and any liens, judgments or creditors' letters regarding unpaid bills.

On December 21, Spehalski notified Union representatives that the Company would not comply with the request for information. Spehalski denied that the Company had ever claimed an inability to pay and stated that the Company's bargaining position was based on the goal of increasing efficiency. The Union did not respond to this letter. On January 24, 1994, the Union submitted an additional request for information concerning the employee pension and 401(k) plans. The Company ignored this request, and on February 1, Stroehmann declared an impasse.

The Syracuse shipping unit was eliminated on February 11.

Subsequently, products destined for Syracuse and upstate New York respectively were loaded onto separate transport trailers at the Pennsylvania bakery. Prior to the dissolution of the shipping unit, the Sayre bakery loaded trucks in bulk (i.e., all white bread on one truck). After that dissolution, trucks were loaded by route (i.e., a mix of bakery products on one truck that are all for delivery on the same route). Upon arrival in Syracuse, the transport drivers now unload their own trucks; route drivers continue to load their own trucks for local delivery. Stroehmann now contracts out the cleaning and maintenance work previously performed by the sanitor.

### B. *Unlawful Direct Dealing*

Sometime in January, 1994, David Cleavenger, the Syracuse facility's sanitor and Local 116's steward, met with Stroehmann General Manager Antonio Leta. According to Cleavenger, the purpose of his visit was to attempt to get the Union and the Company back to the bargaining table. Leta told Cleavenger that all issues were negotiable and that he hoped the parties could work out a deal.

In early February, Cleavenger approached Leta again, this time to discuss the possibility of union decertification. Cleavenger indicated that if the employees were to decertify, they would need "something to sweeten the pot." Cleavenger and Leta discussed the effect of decertification on health insurance benefits and retirement. Leta told Cleavenger that he saw no problem in providing an additional thirty days paid health insurance for retiring employees, and that wage rates were negotiable. Cleavenger then said that he would meet with the other employees to discuss the matter. On February 10, Cleavenger mailed a decertification petition to the Board's Regional Office. The following day, the Company eliminated all bargaining unit positions.

Based on these facts the Board held that because Stroehmann did not provide the information demanded by Local 116, it had not bargained to an impasse over elimination of

the bargaining unit and could not, therefore, eliminate it unilaterally. The Board also held that Stroehmann's discussions with employees regarding decertification were unlawful. The present cross-petitions for review and enforcement followed. On appeal, Stroehmann argues that its refusal to hand over the demanded financial information was permissible and that Leta's conversations with Cleavenger did not constitute unlawful direct dealing.[1]

## DISCUSSION

### A. Elimination of the Syracuse Unit

■ Employers must bargain in good faith with unions that represent a majority of employees in an appropriate unit. 29 U.S.C. § 158(d) (1994); La Porte Transit Co. v. NLRB, 888 F.2d 1182, 1186 (7th Cir.1989). Good faith requires that an employer explain its positions on various issues and that obligation in turn may require that it provide relevant back-up materials, such as financial information. NLRB v. Truitt Mfg. Co., 351 U.S. 149, 152, 76 S.Ct. 753, 755, 100 L.Ed. 1027 (1956). The requirement that relevant information be provided is designed both to reduce the likelihood of closed-mind bargaining and to enhance the chances that the parties will reach an agreement suitable to their major needs. Where an employer refuses to provide relevant information, the employer may be said not to be bargaining in a good faith effort to reach an agreement. Id. at 153, 76 S.Ct. at 756.

■ Of course, companies often want their financial information to remain confidential. For example, such information might be useful to alert a company's competitors to methods of stealing a march in the marketplace. A union's demand for information may thus become a bargaining chip to pressure an employer into concessions out of fear of the economic consequences of the dissemination of the information. A union's demand for information does not, therefore, automatically trigger the employer's obligation to provide it. The Board and the courts must take care that financial information demanded by a union be reasonably related to the rationalization of bargaining. They should also ensure that such a demand not be made solely as a tactic to strengthen the union's hand in negotiations. Finally, they must also take care that overbroad demands for information not be used as an excuse for unions not to bargain in good faith in the hope that the Board will provide a legal remedy more favorable than any likely negotiated agreement.

■ It follows, therefore, that an employer has no duty to turn over financial condition information unless the union can demonstrate a "specific need." Atlanta Hilton & Tower, 271 N.L.R.B. 1600, 1602, 1984 WL 36775 (1984); See E.I. DuPont de Nemours & Co. v. NLRB, 744 F.2d 536, 538 (6th Cir.1984) (per curiam); Prudential Ins. Co. of Am. v. NLRB, 412 F.2d 77, 84 (2d Cir.) (burden is on union to establish relevance of requested information not presumptively relevant), cert. denied, 396 U.S. 928, 90 S.Ct. 263, 24 L.Ed.2d 226 (1969). Where the union can demonstrate that the employer has asserted an inability to pay as its reason for refusing union demands, the union is entitled to receive financial information in order to substantiate the employer's claims. NLRB v. Truitt Mfg. Co., 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956) (employer's failure to disclose information that would substantiate a claim of inability to pay may support a finding of failure to bargain in good faith); Nielsen Lithographing Co., 305 N.L.R.B. 697, 1991 WL 253920 (1991) (where an employer says it cannot pay it must substantiate the claim by disclosing the company's finances), review denied by Graphic Communications Int'l Union v. NLRB, 977 F.2d 1168 (7th Cir.1992). However, where an employer claims only general economic difficulties or business losses as the reason for its position, the employer may lawfully refuse to hand over financial information. Nielsen, 305 N.L.R.B. 697; see also Torrington Extend-A-Care Employee Ass'n v. NLRB, 17 F.3d 580 (2d Cir.1994) (information regarding

---

1. We need not address Stroehmann's arguments that elimination of the bargaining unit in the circumstances described was not a mandatory subject of bargaining and that, even if the refusal to provide the demanded information was unlawful, the Board's order is inappropriate.

a company's general financial forecast does not carry a presumption of disclosure); *United Steelworkers v. NLRB*, 983 F.2d 240, 243–45 (D.C.Cir.1993) (competitive disadvantage and inability to pay are analytically distinct); *NLRB v. Harvstone Mfg. Co.*, 785 F.2d 570, 576 (7th Cir.) (no duty to furnish financial information because employer "never implied that [the Company] was financially unable, as opposed to unwilling, to meet the Union's demands"), *cert. denied sub nom. Local 134 v. Harvstone Mfg. Co.*, 479 U.S. 821, 107 S.Ct. 88, 93 L.Ed.2d 41 (1986).

 In the instant matter, company representatives asserted that, because of financial losses, the company "cannot" continue to operate as it had in the past. However, we must view the totality, rather than isolated statements or words, of the position taken by Stroehmann. So viewed, it is clear that "cannot" meant "will not" and was not an assertion of inability to pay. Indeed, Stroehmann expressly stated that, because of Weston's deep pockets and its desire to keep a foothold in the American market, it could not claim an inability to pay. As we held in *Torrington Extend–A–Care*, comments by a negotiator that a company is "having trouble staying afloat," do not trigger an obligation to provide information where the negotiator explicitly denies an inability to pay and stresses that the company is not insolvent. 17 F.3d at 587–90.

Once Stroehmann conceded that it had access to capital sufficient to continue the Syracuse shipping unit, the Union's need for financial information to bargain intelligently was virtually non-existent. The proposed consolidation of functions in Pennsylvania was claimed to eliminate redundancies in the unloading and reloading in Syracuse, the cost of which was evident from the Union's knowledge of the Syracuse payscale. Stroehmann did not enter the negotiations with a closed mind but rather offered proposals in response to the Union's request for ways to save jobs. It was the Union that refused to bargain after it made a request for financial information better designed to create a legal issue than to inform bargaining.

The comprehensive and detailed information requested by the Union had virtually no relevance to the issues at stake in bargaining over the redundancy of the Syracuse shipping unit and the preservation of some or all of the jobs involved. We conclude, therefore, that Stroehmann was under no obligation to respond to the voluminous requests for information submitted by the Union. *See Torrington Extend–A–Care*, 17 F.3d at 587 (statements by management that certain concessions are necessary as a result of poor financial performance by the company is not the same as an "inability to pay" and do not mandate disclosure of general financial information).

Because Stroehmann's refusal to furnish the information was permissible, it was entitled to declare an impasse when the Union refused to return to the bargaining table. The unilateral decision to close the shipping unit was, therefore, lawful.

### B. *Unlawful Direct Dealing*

 An employer violates Sections 8(a)(1) and (5) of the Act by dealing directly with union-represented employees concerning any mandatory subject of collective bargaining. *Medo Photo Supply Corp. v. NLRB*, 321 U.S. 678, 684, 64 S.Ct. 830, 833, 88 L.Ed. 1007 (1944); *NLRB v. General Electric Co.*, 418 F.2d 736, 755 (2d Cir.1969) (direct dealing is "inherently divisive" and has the effect of "undermining the authority of the ... bargaining representatives"), *cert. denied*, 397 U.S. 965, 90 S.Ct. 995, 25 L.Ed.2d 257 (1970). Here, the Company argues that because Cleavenger was the Union's chief shop steward and a member of the Union negotiating team, Antonio Leta's discussions with Cleavenger do not constitute direct dealing. *Colorado–Ute Elec. Ass'n*, 295 N.L.R.B. 607, 622, 1989 WL 224193 (1989), *rev'd on other grounds*, 939 F.2d 1392 (10th Cir.1991), *cert. denied sub nom. Local No. 111 v. Colorado–Ute Elec. Ass'n*, 504 U.S. 955, 112 S.Ct. 2300, 119 L.Ed.2d 223 (1992). While it may be that, in light of the Union's refusal to bargain, the decision to speak with a member of the Union negotiating team was reasonable, bargaining over decertification was not. Once Cleavenger, who initiated these conversations, brought up the subject of decertification as well as job

preservation and asked for "something to sweeten the pot of decertification," Leta must have understood that Cleavenger was no longer speaking in his capacity as Union Steward. By negotiating with Cleavenger as an individual, therefore, Leta violated Sections 8(a)(1) and (5).[2]

## CONCLUSION

We therefore enforce the Board's order with respect to the direct dealing charge and deny enforcement of the Board's order that Stroehmann reinstate the shipping operation and turn over the requested information.

---

2. The direct dealing finding in this case is supportable. We do note, however, that an employer also may not lawfully negotiate employment in exchange for employees decertifying a union. *NLRB v. Sky Wolf Sales*, 470 F.2d 827, 829 (9th Cir.1972).