10-3709 (L)
SDBC Holdings, Inc. v. NLRB

𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
**FOR THE SECOND CIRCUIT**

August Term 2011

(Argued: October 21, 2011      Decided: March 28, 2013)

Docket Nos. 10-3709 (Lead), 10-4230 (XAP)

SDBC HOLDINGS, INC., F/K/A STELLA D'ORO BISCUIT CO., INC.,

*Petitioner-Cross-Respondent,*

-v-

NATIONAL LABOR RELATIONS BOARD,

*Respondent-Cross-Petitioner.*

Before: CABRANES, LIVINGSTON, and CHIN, *Circuit Judges.*

Petitioner-Cross-Respondent SDBC Holdings, Inc. ("SDBC") petitions for review of a National Labor Relations Board ("NLRB") decision and order concluding that SDBC engaged in unfair labor practices in connection with its failure to give a union representing some of its employees a 2007 audited financial statement that the union sought during collective bargaining. The NLRB cross-petitions for enforcement of its order. We hold that SDBC acted lawfully and so grant its petition. The NLRB's petition is denied. Judge Cabranes concurs in the judgment and in the opinion of the Court and files a separate opinion.

1

MARK A. JACOBY, Weil, Gotshal & Manges LLP, New York, NY (Lawrence J. Baer, *on the brief*) *for Petitioner-Cross-Respondent.*

ELIZABETH A. HEANEY, National Labor Relations Board (Julie Broido, Supervisory Attorney; Lafe E. Solomon, Acting General Counsel; Celeste J. Mattina, Acting Deputy General Counsel; John H. Ferguson, Associate General Counsel; Linda Dreeben, Deputy Associate General Counsel, *on the brief*) *for Respondent-Cross-Petitioner.*

LIVINGSTON, CIRCUIT JUDGE:

Petitioner-Cross-Respondent SDBC Holdings, Inc. ("SDBC"), formerly known as Stella D'oro Biscuit Co., Inc. ("Stella D'oro" or "the Company"),[1] petitions this Court for review of a decision and order by the National Labor Relations Board ("NLRB" or "the Board"), which held that Stella D'oro engaged in unfair labor practices principally by declining to permit Local 50, Bakery, Confectionary, Tobacco Workers and Grain Millers International Union (the "Union" or "Local 50"), to retain a copy of the Company's 2007 audited financial statement (the "2007 Financial Statement" or "Statement") during the course of collective bargaining. The NLRB cross-petitions for enforcement of its order. For the reasons set forth below, we grant SDBC's petition and deny the NLRB's cross-petition.

---

[1] Subsequent to the events giving rise to this litigation, Stella D'oro Biscuit Co., Inc. changed its name to SDBC Holdings, Inc. The change in nomenclature is irrelevant to the resolution of this case.

2

# BACKGROUND

## *I.*

Stella D'oro was a New York corporation engaged in the manufacture of baked goods. It operated a single bakery plant at 184 West 237th Street in the Bronx. The Union represented employees at this plant. In 2006, Brynwood Partners ("Brynwood"), a private equity investment firm, acquired Stella D'oro from Kraft Foods for about $17 million. Brynwood's business model involves purchasing companies (often distressed), improving their value, and then selling them at a profit. Brynwood typically holds a company for a period of five to 10 years before selling. Consistent with Brynwood's overall business model, in the period after Brynwood acquired Stella D'oro, the bakery introduced product and marketing innovations, price increases, and reductions in management staff. Brynwood also provided funding for Stella D'oro's purchase of automated packaging equipment at an expense of $3.1 million.

At the time Brynwood acquired Stella D'oro, a collective bargaining agreement ("CBA") existed between Stella D'oro and Local 50. This agreement by its terms governed the relationship between Stella D'oro and Local 50 for a period of three years, from June 29, 2005, through June 29, 2008. On May 30, 2008, Stella D'oro and the Union held their first formal bargaining session to discuss the

renewal of the contract.[2]   Present at this meeting were Henk Hartong ("Hartong"), the non-executive chairman of Stella D'oro's board of directors as well as a partner at Brynwood, Daniel Myers, Stella D'oro's Chief Operating Officer, and Mark Jacoby ("Jacoby"), counsel for Stella D'oro.   Local 50 was represented by Joyce Alston ("Alston"), President of Local 50, and Calvin Williams ("Williams"), Local 50's Secretary and Treasurer, as well as Mike Filippou ("Filippou") and several other employees of Stella D'oro who were members of Local 50 (together with Alston and Williams, the "Union Committee").

At the May 30 meeting, Stella D'oro's representatives presented the Union Committee with a document that set out a variety of figures concerning Stella D'oro's financial performance and expenses over the last several years (the "May 2008 Report").   Notably, between fiscal year 1997 and fiscal year 2007 (the last year for which data were presented), Stella D'oro's net sales had fallen by over 50 percent, from approximately $52 million in FY 1997 to approximately $24 million in FY 2007.   The May 2008 Report further showed that prices for some of the ingredients Stella D'oro relied on for its baking, including egg yolks, cake flour, bread flour, and palm shortening, had risen steadily over many months, as had the

---

[2] This first formal session had been preceded by an informal meeting between representatives of Brynwood and Local 50 on May 12.

price of transporting Stella D'oro's products. The report indicated that, in fiscal year 2007, Stella D'oro posted an operating loss of roughly $1.6 million.

Jacoby walked the Union Committee through the May 2008 Report, emphasizing Stella D'oro's financial difficulties. According to Alston's testimony in the proceedings before the Administrative Law Judge ("ALJ"), Jacoby explained that Stella D'oro "had to reduce the costs of the labor agreement in order for them to stay in business. . . . [T]hey could not go on with the business unless they were able to further reduce costs." Hartong related, according to Alston, that Brynwood "had bought a troubled company, that [it] had raised the prices of the product twice, that [it] intended to do so again in September," and that Brynwood had also invested in automation. Brynwood wanted to "continue with the company, to help it grow, and become–continue to be a profitable organization." Stella D'oro, however, was losing money and, according to Alston's notes, Brynwood was "not in the business to sustain losses." Jacoby testified that he explained to the Union Committee that, while the hourly wages paid by Stella D'oro to those in higher-skilled positions were competitive with the rates paid by other companies, the hourly wages paid to those in lower-skilled positions were "well above what the competitive wage rates were for those jobs." Indicating that these high wages for unskilled workers "contributed to [Stella D'oro's] very high labor costs," Jacoby affirmed that in the course of bargaining, Stella D'oro would, among other things, pursue proposals aimed at

5

"negotiating some change in that," as well as lengthening the work week and reducing benefit costs.

Alston testified that, during the course of the meeting, she indicated that the Union would "need some sort of financial documentation to prove that [Stella D'oro] really [was] losing this kind of money," before the Union could consider acceding to the sorts of concessions the Company intended to propose. She specifically requested to review financial materials relevant to the 2007 operating losses. Jacoby explained that these losses were reflected in Stella D'oro's 2007 Financial Statement, which he agreed to bring to the next bargaining session. Alston consented to this arrangement.

At the next session, held on June 4, Stella D'oro proposed terms for a new labor contract. Stella D'oro's proposal called for, among other changes, wage cuts across the board, a two-thirds reduction in the number of paid sick days, and a cap on the amount of vacation available to employees. Jacoby recalled justifying the wage cuts as lowering wages to "what [Stella D'oro] believe[d] were the competitive rates for different classifications based on different level[s] of skill." He also explained that Brynwood was prepared to fund losses in the short term, but that it needed a longer contract (five years, as opposed to three) so that it could see "light at the end of the tunnel." According to Filippou, Hartong warned that Brynwood

6

buys companies to make a profit and that it would "take its toy and . . . leave" if SDBC could not be made profitable.

As promised, Jacoby brought a copy of the 2007 Financial Statement, which consisted of only 19 pages, including a title page and table of contents, to the June 4 meeting. He showed Alston the document's single page Statement of Operations, which contained the operating loss figure presented in the May 2008 Report, and told the Union Committee members that they could inspect and take notes on the Statement at the bargaining site "all day," but that he could not provide them with a copy to retain. He explained that Stella D'oro did not want the Statement falling into the hands of competitors, vendors, or customers, lest they learn of Stella D'oro's poor financial condition. Alston offered to sign a confidentiality agreement, but Jacoby demurred, citing difficulty in enforcing such agreements.

Jacoby brought the 2007 Financial Statement not only to the June 4 bargaining session, but to other sessions as well, and he repeatedly invited Alston to remain after the sessions concluded, both to examine it and to take notes. Jacoby also informed Alston that the Statement was available at his office (as well as the bakery), and that the Union's attorney or accountant could examine and take notes on it there. Alston expressed her agreement with this arrangement at the June 4 session.

At the next bargaining session, on June 17, the Union made a counterproposal to Stella D'oro regarding the proposed terms of the new CBA. The Union's proposal called, *inter alia*, for specified wage increases, additional employer contributions to the Union pension plan, and an increase in the number of paid personal days. Upon reviewing the Union's proposal, Jacoby informed the Union, according to Alston, that he felt the Union and Stella D'oro "had a long road to go." Jacoby, according to his own testimony, explained that Stella D'oro was owned by "investor owners who are . . . prepared to make the effort to make this company a company that produces a return on an investment and continues in the business. But we're not going to get there unless we can realign the cost of the business." His notes reflect that he told the Union Committee that, if Stella D'oro was unable to turn a profit, Brynwood's alternative option was to close and sell, and that Brynwood was not "going to go on forever funding losses."

Also on June 17, Stella D'oro and the Union extended the terms of the CBA then in effect for approximately one additional month, through July 31, 2008. In addition, Alston offered to visit Jacoby's office with an accountant or an attorney to review the 2007 Financial Statement. After the June 17 meeting, however, Alston called the Union's attorney, Louie Nikolaidis ("Nikolaidis"), to inform him that she had agreed to go to Jacoby's office to review the 2007 Financial Statement. After speaking to Nikolaidis, Alston changed her mind about the arrangement.

8

The next bargaining session occurred on July 8, 2008. Alston recalled that at this session, Jacoby expressed disappointment that no one from the Union had visited his office to inspect the Statement and take notes on it, as promised. Alston now expressed the view that the Union was entitled to its own copy of the document, but stated that she was "prepared to try to negotiate a contract" notwithstanding the Company's failure to provide it. Also at the July 8 meeting, Filippou suggested that there were two ways Stella D'oro's investors could secure a profit from its operations: by closing the Bronx facility and selling the real estate and the Stella D'oro brand, or by obtaining the sought-after concessions and then selling later for a greater profit. Hartong agreed that either course of action was possible but indicated that Brynwood wanted Stella D'oro's business to succeed.

The bargaining teams met again on July 22 and 23. Over the course of these sessions, Stella D'oro presented a wage and benefit proposal for the first year of the proposed contract in which, among other things, it would cease participation in the Union pension plan and institute, instead, a 401(k) plan with a three percent employer matching contribution. Jacoby related that Stella D'oro would incur a withdrawal penalty of about $6 million for this change, but explained that Brynwood was prepared to incur this cost "in order to get to a lower cost structure for the future so they could . . . get a return on their investment." Despite another contract proposal from Stella D'oro and a counterproposal from the Union, however,

9

little progress was made in the negotiations. Jacoby concluded the July 23 session by stating that his proposal conveyed that day was Stella D'oro's final proposal, and he asked Alston to take the offer to the Union's members for a vote.

On July 26, 2008, all Stella D'oro employees who were members of Local 50 met to determine whether Stella D'oro's proposed CBA was acceptable. After a presentation by the Union Committee and a question and answer session, the employees voted to reject the proposed CBA and go on strike. The Union commenced the strike on August 13, 2008.

On August 27, Stella D'oro mailed Alston a letter informing her that "[i]n light of the continuing impasse in negotiations[] and the strike," Stella D'oro had decided to implement unilaterally the changes to the conditions of employment proposed in its most recent offer. About eight months later, on May 1, 2009, Alston sent a letter to Stella D'oro informing the Company of the Union members' unconditional willingness "to return to work immediately under the terms of the June 29, 2005 through June 29, 2008 collective bargaining agreement."[3] Stella D'oro, however, rejected the offer, taking the position that, because Stella D'oro had already altered the conditions of employment, the employees' willingness to return

---

[3] Under the NLRA, employees who are on strike because of an employer's unfair labor practice are generally entitled to reinstatement after making an unconditional offer to return to work. *See NLRB v. Koenig Iron Works, Inc.*, 681 F.2d 130, 145 (2d Cir. 1982).

to work under the prior agreement was a conditional offer, not an unconditional one.

*II.*

On September 11, 2008, about a month after the commencement of the strike, Local 50 filed a charge against Stella D'oro with the NLRB, on the grounds, *inter alia*, that Stella D'oro impermissibly denied the Union "necessary information . . . during bargaining," thus engaging in an unfair labor practice in contravention of the National Labor Relations Act ("NLRA" or the "Act") § 8(a)(1), (3), and (5). On February 17, 2009, and again on May 7, 2009, the Union filed amended charges, with the latter amended charge adding the allegation that Stella D'oro's failure to reinstate the members of Local 50 in May 2009, when they offered "unconditionally" to return to work, also violated the NLRA. The Regional Director of the NLRB for Region 2 issued a complaint against Stella D'oro on the basis of the Union's charges, as amended, on May 7, 2009. Stella D'oro answered the complaint a few days later, on May 11, 2009.

Over the course of four days in May 2009, a series of witnesses gave evidence before ALJ Steven Davis. On June 30, 2009, the ALJ issued a decision finding that Stella D'oro committed unfair labor practices in violation of the NLRA. *Stella D'oro Biscuit Co.*, 355 N.L.R.B. No. 158, 2010 WL 3446122, at *19 (2010). The ALJ concluded that Stella D'oro had pled an inability (as opposed to unwillingness) to

11

pay the wages and benefits demanded by the members of Local 50 during the bargaining sessions. *Id.* at \*37-43. Thus, the ALJ reasoned, under the NLRB's decision in *Nielsen Lithographing Co.*, the Union was entitled to access to the 2007 Financial Statement on which Stella D'oro's assertions of inability to pay were based. *Stella D'oro Biscuit*, 2010 WL 3446122, at \*43-46; *see Nielsen Lithographing Co.*, 305 N.L.R.B. 697 (1991), *enforced sub nom. Graphic Commc'ns Int'l Union, Local 508 v. NLRB (Nielsen II)*, 977 F.2d 1168 (7th Cir. 1992). The ALJ next concluded that the access furnished by Stella D'oro, in the form of permitting the Union representatives or their agents to inspect the Statement and take notes about it, was inadequate to satisfy Stella D'oro's obligation to provide the Statement to the Union, thus giving rise to an unfair labor practice on the part of Stella D'oro. *Id.* at \*44. The ALJ also determined that Stella D'oro's refusal to furnish the Statement to the Union was a "substantial cause" of the Union's strike. *Id.* at \*48. Because he concluded that Stella D'oro had unlawfully refused to furnish the Statement to the Union, the ALJ found that no valid impasse had arisen, and thus Stella D'oro's unilateral implementation of the changes to the terms of employment in August 2008 constituted another unfair labor practice. *Id.* at \*47. Since Stella D'oro did not have the power unilaterally to alter the conditions of employment, the Union's May 2009 offer to return to work was indeed unconditional, and Stella

12

D'oro committed yet another unfair labor practice by refusing to reinstate its employees. *Id.* at *50.

In a decision and order issued on August 27, 2010, the NLRB, through a divided three-member panel, affirmed the ALJ's decision over several exceptions by Stella D'oro.[4] *Id.* at *1. The NLRB imposed a series of penalties against Stella D'oro, including requiring that Stella D'oro "[m]ake unit employees whole, with interest, for any loss of earnings and other benefits resulting from its unlawful unilateral changes" to the unit employees' terms and conditions of employment. *Id.* at *10.

Member Peter Schaumber dissented. Member Schaumber concluded that Stella D'oro had not taken the bargaining position that it lacked funds to meet the Union's contract demands, but only that it was unwilling to do so. *Id.* at *14-15. The Company, Member Schaumber concluded, "made clear that Brynwood was willing to invest substantial amounts in the Company, with a time horizon for achieving profitability within 5 to 10 years." *Id.* at *14. Thus, the Company "plainly was not contending that it lacked funds to meet the Union's contract demands." *Id.* In such circumstances, Stella D'oro had no obligation to provide the 2007 Financial Statement to the Union. Additionally, Member Schaumber concluded that, even assuming Stella D'oro was required to make the Statement

---

[4] The NLRB slightly modified the ALJ's decision in aspects not relevant on appeal.

available, "its offer to allow the Union and its experts to view and take notes on its audited 2007 financial statement satisfied any obligation it had to provide the Union substantiating information." *Id.* at *15.

Stella D'oro petitioned this Court for review of the NLRB's decision, and the Board cross-petitioned for enforcement of its order.

**DISCUSSION**

Section 8(a) of the NLRA makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5) (2006). This section is violated not only by outright refusal of an employer to come to the bargaining table, but also by an employer's failure to bargain in good faith. *See* 29 U.S.C. § 158(d) ("For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment . . . ."); *see also NLRB v. Truitt Mfg. Co.*, 351 U.S. 149, 149 (1956) ("The National Labor Relations Act makes it an unfair labor practice for an employer to refuse to bargain in good faith with the representative of his employees.").[5]

_____

[5] The NLRA also places a reciprocal obligation on labor representatives. *See* 29 U.S.C. § 158(b)(3) ("It shall be an unfair labor practice for a labor organization or its agents . . . to refuse to bargain collectively with an employer . . . .").

14

In assessing whether the record supports the determination that a party has failed to bargain in good faith, we do not "lightly disregard the [NLRB's] overall appraisal of the situation." *NLRB v. St. Joseph's Hosp.*, 755 F.2d 260, 263 (2d Cir. 1985). "We must enforce the Board's order if the Board's legal conclusions have a reasonable basis in law, and if its factual findings are supported by substantial evidence on the record as a whole." *NLRB v. Windsor Castle Health Care Facilities*, 13 F.3d 619, 623 (2d Cir. 1994) (internal citations omitted); *see* 29 U.S.C. § 160(e) ("The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive."); *see also Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 375 (1998) ("[Administrative] adjudication is subject to the requirement of reasoned decisionmaking . . . ."). We recognize substantial evidence to mean "more than a mere scintilla" of evidence, or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Torrington Extend-A-Care Emp. Ass'n v. NLRB*, 17 F.3d 580, 590 (2d Cir. 1994) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).

Based on the record and relevant case law, we conclude that the Board's determination that Stella D'oro asserted an inability to pay was not sufficiently supported by the evidence, and that the Board erred in applying established law to the facts in this case. In addition, and even assuming that Stella D'oro had an

15

obligation to provide the Union with the 2007 Financial Statement, we conclude that the Board's finding that Stella D'oro failed to satisfy this obligation is also insufficiently supported by the evidence. Accordingly, we grant SDBC's petition and deny the NLRB's.

*I. Inability to Pay*

The refusal of an employer "to attempt to substantiate a claim of inability to pay increased wages," the Supreme Court has said, "may support a finding of a failure to bargain in good faith" depending on the circumstances of a particular case. *Truitt*, 351 U.S. at 153. But as the NLRB emphatically proclaimed in *Nielsen Lithographing*, there is a difference–and a "critical" one–between the employer who claims a "present" or "prospective inability to pay during the life of the contract being negotiated," and the employer "who claims only economic difficulties or business losses or the prospect of layoffs." 305 N.L.R.B. at 700. As this Court explained after *Nielsen*, "an employer has no duty to turn over financial condition information unless the union can demonstrate a 'specific need.'" *Stroehmann Bakeries, Inc. v. NLRB*, 95 F.3d 218, 222 (2d Cir. 1996) (quoting *Atlanta Hilton & Tower*, 271 N.L.R.B. 1600, 1602 (1984)). And no such need for financial information exists where an employer has professed only an unwillingness to meet the union's demands, as opposed to, expressly or by implication, claiming it cannot do so during the term of the very contract being negotiated. *Id.* at 222-23.

16

*A. Insufficient Evidence to Support Board Conclusion of Inability to Pay*

Contrary to the decision of the Board majority, the record is clear that Stella D'oro's bargaining position was based on its unwillingness, and not its inability, to meet the Union's contract demands. Stella D'oro's parent company, Brynwood, had invested $3.1 million in Stella D'oro to introduce automated packaging equipment immediately before bargaining began–a fact that Stella D'oro pointed out during the course of its discussions with the Union. Brynwood also expressed its willingness during bargaining to expend an additional $6 million to extricate Stella D'oro from the Union's pension plan, thus evidencing at the bargaining table itself that Stella D'oro had access to substantial capital from its parent owner. As the Board majority determined, moreover, Stella D'oro's chief negotiator expressly informed the Union during bargaining that Brynwood, an investment firm that "purchases companies with the aim of improving their financial condition and then selling them at a profit in 5 to 10 years," was "prepared to fund losses." And Hartong, a Brynwood partner, explicitly told the Union Committee that Brynwood's desire was "to invest in the operation and make it profitable." *Stella D'oro Biscuit*, 2010 WL 3446122, at *28. Given such evidence, we agree with Member Schaumber that Stella D'oro "plainly was not contending that it lacked funds to meet the Union's contract demands." *Id.* at *14. Rather, its position was that it would not meet such

17

demands "if the wage scales and labor costs were not restructured to help achieve profitability." *Id.*

The NLRB acknowledges that Stella D'oro never expressly pled an inability to pay. The Board majority nevertheless concluded that Stella D'oro impliedly did so, because its negotiators made clear that Stella D'oro was losing money and would be cut off from Brynwood's supply of cash if the Union did not grant the sought-after concessions. The Board majority relied principally on the testimony of Union representatives Alston and Filippou to the effect that Jacoby and Hartong asserted throughout the negotiations that the Company was "not going to be able to survive," "might have to close the business" and was a "bleeding, distressed asset–a losing proposition." *Id.* at *2. These statements, however, must be viewed in context, for *Truitt* instructs that we should not find inability to pay "in every case in which economic inability is raised as an argument." *Truitt*, 351 U.S. at 153; *see Atlanta Hilton & Tower*, 271 N.L.R.B. 1600, 1602 (1984) ("Although no magic words are required to express an inability to pay, the words and conduct must be specific enough to convey such a meaning."). And while Jacoby and Hartong unsurprisingly stressed Stella D'oro's financial difficulties, they repeatedly characterized their bargaining position in terms of what Brynwood was willing to do with its investment, not what Stella D'oro itself could or could not afford. Thus, in the words of one official, Brynwood made clear that it would "take [its] toy and . . .

18

leave" unless it got concessions. Joint App'x at 100. And when pressed by Filippou, Hartong acknowledged that selling Stella D'oro off immediately to turn a profit was an option, but he reiterated that though "we could do that at any time . . . it's not the option that we prefer. The option we prefer is to try to improve the company's financial condition, return it to profitable condition." Joint App'x at 241-42. These are statements of unwillingness to pay, not inability to pay, and the record simply does not support the majority's conclusion to the contrary.

Moreover, the Board majority also based its conclusion regarding inability to pay on a factual assertion relied on by the ALJ that is unsupported in the record. The ALJ determined that, even assuming Brynwood was willing to provide capital to cover Stella D'oro's losses, it was supposedly only willing to do so for the "short term," which the ALJ characterized as shorter than the five-year contract that Stella D'oro proposed. The Board alluded to this finding, characterizing Brynwood's commitment to funding Stella D'oro's losses as "emphatically 'short term.'" *Stella D'oro Biscuit*, 2010 WL 3446122, at *5. However, we are unable to find any evidence in the record, much less substantial evidence, to support the claim that Brynwood's time horizon was as the ALJ described. *See St. Joseph's Hosp.*, 755 F.2d at 263 (noting this Court's obligation to reject factual findings not supported by substantial evidence). Rather, as Member Schaumber concluded, while Stella D'oro took the position in bargaining that it was losing money and could not go on with

19

the business unless it reduced costs, it never claimed an inability to pay the wages and benefits sought by the Union during the contract term under negotiation: instead, its statements "merely reflected the Respondent's unwillingness to indefinitely continue operating at a loss, and its desire to achieve profitability within 5 to 10 years." *Stella D'oro Biscuit*, 2010 WL 3446122, at *15. For this reason, too, we conclude there is insufficient evidence to support the Board majority's finding that Stella D'oro pled inability to pay.

*B. Erroneous Application of* Stroehmann *and* United Stockyards

We further conclude that the Board majority acted arbitrarily in its treatment of this Court's decision in *Stroehmann* and in its reliance on *Sioux City Stockyards*, 293 N.L.R.B. 1 (1989) ("*United Stockyards*"), *enf'd*, 901 F.2d 669 (8th Cir. 1990) (per curiam). The majority failed to provide a reasoned explanation as to how this case differs from *Stroehmann*, involving closely analogous facts, or alternatively, why it disagrees with *Stroehmann*'s result. The Board majority purported to rely on its decision in *United Stockyards*. But *United Stockyards* is a case *predating* the Board's landmark decision in *Nielsen*–and, moreover, a case not even involving the effect of an employer's bargaining representations regarding its access to a parent company's capital on the question whether it has pled inability to pay. In such circumstances, the Board has acted arbitrarily and its petition for enforcement must be denied. *Cf. Nielsen Lithographing Co. v. NLRB*, 854 F.2d

20

1063, 1067 (7th Cir. 1988) (noting that the Board has a duty "to take a stance, to explain which decisions it agree[s] with and why, and to explore the possibility of intermediate solutions" with respect to circuit precedent).

*Stroehmann*, like the present case, involved a bakery represented in bargaining to be suffering losses, but owned by a parent company willing to extend capital. 95 F.3d at 220. The Board found that Stroehmann's bargaining posture was that its parent company "would not continue to subsidize the Company [absent concessions], and the Company could not afford to continue the present unit complement and wage scales, let alone a wage increase" without access to the parent company's funds. *Stroehmann Bakeries*, 318 N.L.R.B. 1069, 1079 (1995). The Board determined that Stroehmann was therefore asserting an inability to pay, triggering an obligation to provide financial information to the union. This Court disagreed:

> Once Stroehmann conceded that it had access to capital sufficient to continue the Syracuse shipping unit [without change], the Union's need for financial information to bargain intelligently was virtually nonexistent. . . . Stroehmann did not enter the negotiations with a closed mind but rather offered proposals in response to the Union's request for ways to save jobs. It was the Union that refused to bargain after it made a request for financial information better designed to create a legal issue than to inform bargaining.

*Stroehmann*, 95 F.3d at 223.

21

Here, the Board majority found this Court's decision in *Stroehmann Bakeries* inapplicable for two reasons, neither of which withstands analysis. First, according to the majority, the parent company in *Stroehmann* was a Canadian company that "intended to maintain a foothold in the American baking industry and was therefore willing to bail Stroehmann out financially." *Stella D'oro Biscuit*, 2010 WL 3446122, at \*5 (quotation marks omitted). But this characterization of the *Stroehmann* parent company, meant to contrast with Brynwood here, omits a crucial fact: namely, that the Board in *Stroehmann* explicitly found that the parent company's willingness to subsidize its subsidiary *was dependent on concessions*. As the ALJ here noted, the parent company in *Stroehmann* "continued to fund Stroehmann's losses, but would not continue to do so without certain changes including a drastic reduction in wages and benefits in order to decrease its financial losses." *Id.* at \*40.

Rather than acknowledging the parallels between *Stroehmann* and the instant case, the Board majority next pointed out that it was undisputed in *Stroehmann*, unlike the situation here, that the employer had expressly denied it was claiming an inability to pay. *Id.* at \*3. The union in *Stroehmann*, however, had charged the company with asserting an inability to pay in a written request for financial information–thus providing an occasion for the employer's express denial

22

in responding to the union's request. *Stroehmann*, 95 F.3d at 221. Such a circumstance was not found to be present in the instant case.

More fundamentally, moreover, the Board has not in the past hinged its analysis whether an employer has failed to bargain in good faith by declining to provide financial information on the question whether the employer expressly denied an inability to pay. Instead, the Board in *Nielsen* placed the burden on the union to establish that the employer's provision of supporting documentation was necessary to facilitate the bargaining process because the employer was claiming an inability to pay. *Nielsen Lithographing*, 305 N.L.R.B. at 699 (noting that union "must prove that the requested general financial information is relevant"); *see Stroehmann*, 95 F.3d at 222 ("Where the union can demonstrate that the employer has asserted an inability to pay as its reason for refusing union demands, the union is entitled to receive financial information in order to substantiate the employer's claims."); *see also ConAgra, Inc. v. NLRB*, 117 F.3d 1435, 1439 (D.C. Cir. 1997) (reiterating that it is the union's duty to demonstrate the relevance of financial information in order to require an employer to turn it over). Nor do we find the majority's cramped interpretation of *Stroehmann* to be faithful to *Stroehmann*'s holding. The *Stroehmann* Court did not reject the NLRB's inability-to-pay conclusion because the employer there used "magic words" when explicitly questioned. *See Atlanta Hilton & Tower*, 271 N.L.R.B. at 1602 (cautioning against

23

conditioning inability-to-pay analysis on the invocation of "magic words"). Rather, this Court credited the subsidiary's access to the parent company's capital as demonstrative of its ability to pay, noting that both the Board and courts must take care that requests for financial information not serve "as an excuse for unions not to bargain in good faith in the hope that the Board will provide a legal remedy more favorable than any likely negotiated agreement." *Stroehmann*, 95 F.3d at 222.

   In concluding that Stella D'oro pled inability to pay, the Board cited *United Stockyards* for the proposition that only the subsidiary's financial condition matters in an inability-to-pay case. The Board explained that "it is Stella's ability to pay, not Brynwood's, that is at issue here." *Stella D'oro Biscuit*, 2010 WL 3446122, at *5. *United Stockyards*, however, was decided prior to this Court's decision in *Stroehmann* and the Board's landmark decision in *Nielsen*. Indeed, *United Stockyards* has been characterized by this Court as an example of pre-*Nielsen* Board law–law fundamentally altered by the *Nielsen* decision. *See Torrington Extend-A-Care Emp. Ass'n*, 17 F.3d at 589. Moreover, even if this were not the case, *United Stockyards* does not even address bargaining representations regarding a corporate parent's willingness to provide funding, much less elucidate the effect of such representations on whether a subsidiary has asserted an inability to pay. After the Court of Appeals for the Eighth Circuit enforced the NLRB's order in *United Stockyards* without addressing its passing treatment of the parent-

24

subsidiary distinction, moreover, the dicta in *United Stockyards* on which the NLRB now relies has not been followed in any subsequent Board or court of appeals decision.

As this Court explained in *Stroehmann*, the requirement that an employer provide financial information should only extend to information "reasonably related to the rationalization of bargaining." 95 F.3d at 222. The provision of *relevant* information furthers the NLRA's requirement of "good faith" bargaining–*i.e.*, bargaining that is both honest and informed–by "reduc[ing] the likelihood of closed-mind bargaining and . . . enhanc[ing] the chances that the parties will reach an agreement suitable to their major needs." *Id.*; *see also Truitt*, 351 U.S. at 152 ("Good-faith bargaining necessarily requires that claims made by either bargainer should be honest claims."); *Nielsen II*, 977 F.2d at 1170 ("If [the information requested] is relevant, the union . . . is entitled to it[.]"). But when an employer's bargaining position is that it is able to fund the union's demands by reason of its access to a parent's capital but that it does not want to do so, because these demands are inconsistent with meeting the parent's financial benchmarks, the provision of the subsidiary's financial information will not generally further the ends of bargaining. For in such a situation, the question driving bargaining is not what a subsidiary *could* feasibly afford, but what its parent company has decided, in its business judgment, that it is willing to do.

25

The Supreme Court cautioned in *Truitt* that it does not automatically follow that employees are entitled to substantiating evidence "in every case in which economic inability is raised as an argument against increased wages." 351 U.S. at 153. "Each case must turn upon its particular facts." *Id.* To be clear, there is substantial evidence in the record that Stella D'oro's negotiators informed the Union Committee that Stella D'oro was losing money and that, while Brynwood would fund losses and provide the investment necessary to turn the company around, the Bronx plant would likely be sold, along with the Stella D'oro brand, if the parties could not reach an accord. We do not hold that in such circumstances the Board might not conclude that a duty to provide financial information should be triggered, and provide reasons as to why. Yet we read *Stroehmann* as consistent with the *Truitt-Nielsen* case law demanding a full consideration of the negotiating situation as well as the parties' statements, and we follow *Stroehmann*'s holding that considering a parent's desire to fund the struggling subsidiary is important and often indicative of both an ability to pay and a good faith bargaining position premised on this reality. To the extent that the Board insists that *United Stockyards* provides support for its conclusion and that *Stroehmann* is not to the contrary, it should clarify its position through reasoned decisionmaking.

## II. Union Review of the Financial Statements

There is another reason, moreover, that the NLRB's petition for enforcement must be denied and SDBC's petition for review granted. Even assuming that Stella D'oro had an obligation to provide the 2007 Financial Statement to the Union, the record is clear that Stella D'oro fully complied with that obligation by affording the Union multiple opportunities to examine and take notes on the 19-page Financial Statement that the Union had requested. As we have explained:

> The union is not automatically entitled to substantiating information in the exact manner requested in every case where the employer claims an inability to pay a wage increase. "Each case must turn upon its particular facts. The inquiry must always be whether or not under the circumstances of the particular case the statutory obligation to bargain in good faith has been met."

*St. Joseph's Hosp.*, 755 F.2d at 263-64 (quoting *Truitt*, 351 U.S. at 153-54). Here, Stella D'oro raised a legitimate confidentiality concern, as the Board majority has acknowledged, and then "offer[ed] to cooperate with the [U]nion in reaching a mutually acceptable accommodation." *Id.* at 265 (quoting *Soule Glass & Glazing Co. v. NLRB*, 652 F.2d 1055, 1098 (1st Cir. 1981). On this record, the Board majority lacked substantial evidence for its conclusion that only a photocopy could afford the Union sufficient access to the 2007 Financial Statement to substantiate Stella D'oro's claims regarding its unprofitability.

27

In upholding the ALJ's conclusion that Stella D'oro failed to bargain in good faith by refusing the Union a photocopy of the 2007 Financial Statement, the Board majority credited the ALJ's findings that the volume and nature of the information in the statement, the assurance of accuracy generated by a photocopy, and the comparative cost and convenience to the parties all supported the Union's need for the photocopy. The Board majority also reasserted the ALJ's conclusion that Stella D'oro's legitimate confidentiality concerns could be adequately met by the Union's promised signature on a confidentiality agreement; it did not address Jacoby's concerns about the enforceability of such agreements. Finally, the Board majority decided that the 19-page document was too complex and detailed to copy by hand, ostensibly in line with Board cases such as *American Telephone & Telegraph Co.* and *Union Switch & Signal, Inc.* *See Union Switch & Signal, Inc.*, 316 N.L.R.B. 1025, 1033 (1995) (finding it too laborious to copy by hand an air-quality study with 12 pages of detailed tabulations); *Am. Tel. & Tel. Co.*, 250 N.L.R.B. 47, 54 (1980), *enforced sub nom. Commc'n Workers of Am. AFL-CIO, Local 1051 v. NLRB*, 644 F.2d 923 (1st Cir. 1981) (finding over 50 pages of documents plus attachments too lengthy to copy by hand); *cf. Abercrombie & Fitch Co.*, 206 N.L.R.B. 464, 466-67 (1973) (holding that the Company's refusal to provide a photocopy of three and one-half pages of documents containing a confession and copies of cash register records was not an unfair labor practice).

28

The Board's conclusion does not adequately take into account all of the evidence demonstrating the Company's willingness to produce the document in multiple venues for the Union to examine and take notes. In the May 30 meeting, Alston requested to see the information that supported the 2007 losses claimed in Stella D'oro's financial presentation. Jacoby promised to bring the 2007 Financial Statement reflecting these losses to the next bargaining session, and Alston agreed. At the very next session, Alston reviewed the operating loss data in the audited 2007 Financial Statement and was thus able to confirm that Stella D'oro had, in fact, incurred approximately $1.6 million in losses for that year, as asserted by the Company at the first bargaining session.

This is not the only way in which Stella D'oro made the requested information available. The Company brought the complete 2007 Financial Statement to multiple bargaining sessions, offering to permit the Union to examine it for as long as Union Committee members desired. Stella D'oro also volunteered, *inter alia*, to provide the Statement to the Union and its lawyer or accountant at Jacoby's office. Alston unsurprisingly agreed to this proposal on two separate occasions because, as Member Schaumber said in dissent, "[v]isiting Jacoby's office to examine the financial statement would have imposed little burden on the Union's attorney or accountant, as their offices were in midtown Manhattan near Jacoby's office." *Stella D'oro Biscuit*, 2010 WL 3446122, at *16. But after Alston consulted

29

with Union attorney Nikolaidis, the Union reneged on this arrangement, despite the fact that the 2007 Financial Statement, which we have examined, is a "straightforward and uncomplicated document that could easily be reviewed in one visit." *Id.* Indeed, except at the bargaining session on June 4, 2008, the Union did not *ever* take advantage of multiple opportunities to further examine and take notes on the Statement prior to striking, notwithstanding the claimed centrality of the 2007 Financial Statement to its bargaining position. Such conduct strongly suggests that the Union's request for the 2007 Financial Statement was "a tactic to strengthen the union's hand in negotiations," *Stroehmann*, 95 F.3d at 222, and an attempt to bolster a possible unfair-labor-practices charge, *see id.*, rather than a good faith effort to obtain information relevant to bargaining. *See also id.* (cautioning that "[t]he Board and the courts must take care that . . . demands for [financial] information not be used as an excuse for unions not to bargain in good faith in the hope that the Board will provide a legal remedy"); *Nielsen II*, 977 F.2d at 1170.

In examining the document in full, we also disagree with the Board's conclusion that the document is analogous to the detailed documents at issue in *AT&T* and *Union Switch & Signal*. As discussed, the Union acknowledged that the financial summary that Stella D'oro provided at the first negotiation was drawn from the Statement of Operations, which was a straightforward, one-page summary

30

within the 2007 Financial Statement shown to Alston at the June 4 meeting. Moreover, at least nine of the 19 pages in the 2007 Financial Statement consist exclusively of accounting summary or title pages rather than relevant financial information. There is simply no basis in the record to conclude that this Statement–which could easily have been copied in a single session–is akin to the complex and highly technical air-quality study at issue in *Union Switch & Signal* or the over-50 pages of employee records at stake in *American Telephone & Telegraph*. Rather, this situation is more analogous to *Abercrombie & Fitch Co.*, where the Board concluded that a photocopy was not necessary because the company did not deny the union an opportunity to take notes, and neither the volume nor the nature of the information warranted requiring the employer to furnish copies. 206 N.L.R.B. at 466-67.

Lacking substantial evidence for its factual findings, the Board erred in concluding that Stella D'oro's refusal to give the Union a copy of the Statement constituted an unfair labor practice. Furthermore, because Stella D'oro did not commit an unfair labor practice by declining to turn over the Statement, a valid impasse did in fact arise between Stella D'oro and the Union, such that Stella D'oro's unilateral implementation of changes to the terms of employment in August 2008 did not constitute an unfair labor practice either. *See Taft Broad. Co., WDAF AM-FM TV*, 163 N.L.R.B. 475, 478 (1967) ("[A]fter bargaining to an impasse, . . . an

31

employer does not violate the [NLRA] by making unilateral changes that are reasonably comprehended within his pre-impasse proposals.").

Finally, Stella D'oro did not commit an unfair labor practice by refusing to reinstate the striking Union members following their offer to return to work in May 2009 under the terms of the *prior* collective bargaining agreement. "It is settled that . . . an employer violates Section 8(a)(3) and (1) of the Act by failing to immediately reinstate strikers [who are opposing an unfair labor practice] upon their unconditional offer to return to work, unless the employer establishes a legitimate and substantial business justification for failing to do so." *Zimmerman Plumbing & Heating Co.*, 334 N.L.R.B. 586, 588 (2001); *see also NLRB v. Koenig Iron Works, Inc.*, 681 F.2d 130, 145 (2d Cir. 1982) ("Employees who . . . strike [because of an employer's unfair labor practice] are entitled to immediate reinstatement, even if replacements have been hired, provided that they make an unconditional offer to return to work."). For two reasons, Stella D'oro did not violate this rule. First, as we have already explained, Stella D'oro did not commit an unfair labor practice, and therefore the strikers did not qualify for protection as strikers opposing an unfair labor practice. *Cf. Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 278 (1956) ("[P]etitioners' unfair labor practices provide adequate ground for the orderly strike that occurred here. Under those circumstances, the striking employees do not lose their status and are entitled to reinstatement . . . ."). Second,

32

the employees sought to return to work under a collective bargaining agreement that was no longer in force, since the employer had already lawfully changed the terms and conditions of employment. Accordingly, the employees' offer was conditioned on a change (or reversion) in the terms of their employment, and thus Stella D'oro did not commit an unfair labor practice by refusing the Union's offer.

**CONCLUSION**

To summarize, we conclude that:

(1) There is insufficient evidence in the record to support the Board's conclusion that Stella D'oro pled an "inability to pay," thereby triggering a duty for the Company to substantiate those assertions; moreover, the Board erroneously disregarded settled law in failing to properly apply or distinguish through reasoned decisionmaking *Stroehmann Bakeries*.

(2) Even if the facts supported a conclusion that Stella D'oro pled an inability to pay, Stella D'oro adequately substantiated its assertions by making the 2007 Financial Statement available to Union representatives for examination and note-taking, and therefore the Company acted lawfully.

Accordingly, SDBC's petition for review of the NLRB's decision is GRANTED, and the NLRB's cross-petition for enforcement of its August 27 order is DENIED.

33

JOSE A. CABRANES, *Circuit Judge*, concurring:

I join Judge Livingston's well-reasoned opinion, which faithfully applies difficult Circuit precedent. I write separately merely to indicate how, in future cases, the National Labor Relations Board (the "Board") might align its precedents more closely with the teaching of the Supreme Court in *NLRB v. Truitt Manufacturing Co.*, 351 U.S. 149, 153 (1956). In my view, the facts in this case could, in principle, support a conclusion that Stella D'oro claimed an "inability to pay" for existing wages and employee benefits when it claimed that its operations were unprofitable. We cannot enforce the Board's decision to that effect, however, because the Board did not adequately explain its reasons for not following our decision in *Stroehmann Bakeries, Inc. v. NLRB*, 95 F.3d 218 (2d Cir. 1996), which equated the concept of "inability to pay" with insolvency. When applying the National Labor Relations Act, panels of this Court are bound by the decisions of prior panels unless overruled by the Supreme Court or an *en banc* panel of this Court, *In re Zarnel*, 619 F.3d 156, 168 (2d Cir. 2010), or controverted through "reasoned decisionmaking" of the Board, *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998). As Judge Livingston explains, the Board's analysis does not meet this standard.

In time, the Board may have occasion to revisit this issue and produce a more precise ruling that, in turn, will implicate principles of agency deference, thereby permitting Courts of Appeals to reconsider the concept of "inability to pay." In this event, the Board should explain that an employer claims an "inability to pay" for particular labor costs, within the meaning of the Supreme Court's decision in *Truitt*, when the employer asserts in the course of bargaining that its operations are *unprofitable* given those costs.

**A.**

The refusal of an employer "to attempt to substantiate a claim of inability to pay increased wages," the Supreme Court held in *Truitt*, "may support a finding of a failure to bargain in good

1

faith," depending on the circumstances of a particular case. 351 U.S. at 153. The Court explained:

> Good-faith bargaining necessarily requires that claims made by either bargainer should be honest claims. This is true about an asserted inability to pay an increase in wages. *If such an argument is important enough to present in the give and take of bargaining, it is important enough to require some sort of proof of its accuracy.* And it would certainly not be farfetched for a trier of fact to reach the conclusion that bargaining lacks good faith when an employer mechanically repeats a claim of inability to pay without making the slightest effort to substantiate the claim.

*Id.* at 152–53 (emphasis supplied); *see also N.Y. Printing Pressmen & Offset Workers Union No. 51, Int'l Printing v. NLRB*, 538 F.2d 496, 499–500 (2d Cir. 1976) (offering a particularly lucid explanation of the duty to substantiate under *Truitt*).

However, the Supreme Court in *Truitt* did not define the term "inability to pay," and courts later disagreed about whether an employer must substantiate an assertion "that complying with the union's request would place it at a competitive disadvantage." *Torrington Extend-A-Care Emp. Ass'n v. NLRB*, 17 F.3d 580, 588 (2d Cir. 1994). The Board settled this question in *Nielsen Lithographing Co.*, 305 N.L.R.B. 697 (1991), holding that a "claim of competitive disadvantage is not the same as a claim of financial inability to pay," *id.* at 699, and that the difference between these two types of claims is "critical" in determining whether an employer has a duty to substantiate, *id.* at 700; *see also Stroehmann*, 95 F.3d at 222–23. In short, an employer need not substantiate an assertion that it is not able to "make as much of a profit as it wishe[s]." *Nielsen*, 305 N.L.R.B. at 701.

The Board's decision in *Nielsen*, however, presupposes (and makes explicit) that an employer is "unable to pay" for certain labor costs if doing so would leave the business "unprofitable." *See id.* ("Nothing in the [employer's] statements to the Union . . . fairly suggests that the [employer] would be *unprofitable* and thus *unable to pay* during the term of the contract under negotiation." (emphases supplied)). In other words, as the Board explained two years after deciding *Nielsen*, a duty to substantiate can arise when an employer asserts in the course of bargaining that it cannot "economically afford" existing labor costs. *Shell Co. (Puerto Rico) Ltd.*, 313 N.L.R.B. 133, 133 (1993);

2

*see also Buffalo Concrete*, 276 N.L.R.B. 839, 840 (1985) ("inability to afford the cost"). By contrast, a duty to substantiate was not triggered in *Nielsen* because "the employer repeatedly stated that it was *still making a profit*." *Shell Co.*, 313 N.L.R.B. at 133 (emphasis supplied).

In sum, the doctrine established by the Supreme Court in *Truitt* uses "inability to pay" as a term of art that should not be understood literally as applying only when the employer is broke. Rather, "[t]he obligation [to substantiate usually] arises if the Employer puts in issue its ability to *afford* the Union's demands."[1] *N.Y. Printing Pressmen*, 538 F.2d at 501 (emphasis supplied).

**B.**

Unfortunately, the Board seems to have confused matters in *Nielsen* by referring to an employer's "losses of business to competitors," 305 N.L.R.B. at 697, as "business losses," *id.* at 700. The Board explained that "the employer who claims only economic difficulties or business losses or the prospect of layoffs is simply saying that it does not want to pay," *id.*, by which the Board meant that "the employer who claims only economic difficulties or [losses of business to competitors] or the prospect of layoffs is simply saying that it does not want to pay,"[2] *id.*

---

[1] Claims of unprofitability must be "put in issue," *N.Y. Printing Pressmen*, 538 F.2d at 501, to trigger a duty to substantiate. *See, e.g., Atlanta Hilton & Tower*, 271 N.L.R.B. 1600, 1602 (1984) (no asserted "inability to pay" where employer would not confirm or deny that it was profitable). For this reason, an employer's acknowledgment of prior financial losses "does not necessarily place it in the posture of having pleaded an inability to pay" in the relevant labor negotiation. *NLRB v. Harvstone Manufacturing Co.*, 785 F.2d 570, 576 n.5 (7th Cir. 1986) (citing *Vore Cinema Corp.*, 254 N.L.R.B. 1288, 1292 (1981)). In *Vore*, for example, an employer had previously stated that its operations were unprofitable, but these statements were made "in a different context" and "long before [labor] negotiations began" and did not "evidence that [the employer's] position *in negotiations* was based on a plea of poverty." *Vore*, 254 N.L.R.B. at 1292 (ALJ opinion) (emphasis supplied).

[2] *Nielsen*, one must recall, involved an employer's assertions that "wage cuts were necessary if the company was to remain competitive and reverse a trend of losing business to lower-cost competitors," *Nielsen Lithographing Co. v. NLRB*, 854 F.2d 1063, 1065 (7th Cir. 1988) ("*Nielsen I*"), but the parties agreed that the employer could be profitable in the short term, *see id.* at 1064. As the Court of Appeals for the Seventh Circuit (the "Seventh Circuit") explained in denying the Board's first petition for enforcement, "[t]here is . . . no contradiction in a company's stating on the one hand that it is profitable and on the other hand that its costs are higher than its competitors' and it wants to reduce them." *Id.* The Board in *Nielsen* also explicitly endorsed the approach taken by the Seventh Circuit in *Harvstone*, which equated the term "inability to pay" with a company's "financial inability to pay," 785 F.2d at 575, and its inability to "afford to pay," *id.* at 577. The Board dissenting opinion in *Nielsen* also illustrates the Board's idiosyncratic use of the term "business losses" to mean "losses of business." *See Nielsen*, 305 N.L.R.B. at 705 (Stephens, Member, dissenting) (equating "business losses" with "loss of business"); *id.* at 708 ("[T]he [employer] directly placed its economic condition at issue by its repeated references to the specific *loss of jobs and business* that already had occurred, and by its statements that *additional*

The Board's use of the term "business losses" to mean "losses of business to competitors" was unintentionally confusing. In normal parlance, the term "business losses" refers to the depletion of assets (or accumulation of debt) resulting from "a business operation where expenditures exceed receipts"—not losses of a business's customers or market share. JOHN BLACK ET AL., OXFORD DICTIONARY OF ECONOMICS (3d ed. 2009). In other words, a company earning "profit" cannot also incur "business losses" because in this context those terms are antonyms. Nonetheless, imprecise use of language does not warrant a change in the relevant legal doctrine.[3]

Our opinion in *Stroehmann Bakeries, Inc. v. NLRB*, 95 F.3d 218 (2d Cir. 1996), suggests that we may have misunderstood the Board's idiosyncratic use of the term "business losses." Pointing to the Board's decision in *Nielsen*, we stated that "where an employer claims only general economic difficulties or business losses as the reason for its position, the employer may lawfully refuse to hand over financial information." *Stroehmann*, 95 F.3d at 222. It is not entirely clear what we meant, but we likely understood "business losses" to mean *financial* losses (rather than the Board's idiosyncratic meaning—losses of customers and market share).

The Board need not, and should not, perpetuate that mistake. Instead, it can, and should, clarify that an employer's assertion of unprofitability is an assertion of "inability to pay" for labor costs within the meaning of *Truitt*. Indeed, the Board made that point explicitly in *Nielsen*, 305 N.L.R.B. at 701, as did the Court of Appeals decision enforcing the Board's order, *Nielsen II*, 977

---

*losses* would continue to occur in the absence of union concessions." (emphases supplied)). The Seventh Circuit decision enforcing the Board's *Nielsen* order also emphasized the importance of claims of unprofitability: "If the employer claims that it cannot afford to pay . . . the [contested] wage, the union is entitled to demand substantiation." *Graphic Commc'ns Int'l Union, Local 508 O-K-I, AFL-CIO v. NLRB*, 977 F.2d 1168, 1170 (7th Cir. 1992) ("*Nielsen II*"); *see also ConAgra, Inc., v. NLRB*, 117 F.3d 1435, 1443 (D.C. Cir. 1997) (equating an inability to *pay* with an inability to *afford*, and emphasizing that the employer had "stated repeatedly that the company remained profitable").

[3] Administrative adjudication requires "reasoned decisionmaking," *Allentown Mack*, 522 U.S. at 374, and therefore no weight should be placed on the NLRB's subsequent statements that "'[i]nability to pay' means that the company presently has insufficient *assets* to pay or that it would have insufficient *assets* to pay during the life of the contract that is being negotiated," *AMF Trucking & Warehousing, Inc.*, 342 N.L.R.B. 1125, 1126 (2004) (emphases supplied). The Board has not explained why "inability to pay" has evolved from meaning that an employer "could not afford" certain labor costs, *see, e.g.*, *N.Y. Printing Pressmen*, 538 F.3d at 499, to meaning literal insolvency.

F.2d at 1170. And it defies common sense to think that employees interested in preserving their jobs will wait until their employer becomes insolvent before they are prepared to discuss, or make, significant bargaining concessions.

Finally, it is worth stressing that the Supreme Court in *Truitt* did not confine the duty to substantiate to assertions of an "inability to pay" for particular labor costs. "There can be no question of the general obligation of an employer to provide information that is needed by the bargaining representative for the proper performance of its duties." *NLRB v. Acme Indus. Co.*, 385 U.S. 432, 435–36 (1967); *see also Stroehmann*, 95 F.3d at 222 ("Good faith requires that an employer explain its positions on various issues and that obligation in turn may require that it provide relevant back-up materials, such as financial information."). Whether an employer's assertions in bargaining give rise to this "general obligation" to substantiate will always depend on the totality of the circumstances, *see Truitt*, 351 U.S. at 153–54, and claims of unprofitability can trigger this duty regardless of whether they fall within the scope of the term of art "inability to pay." Indeed, generating profit is indisputably the paramount (and existential) concern of a business entity, and when an employer claims during bargaining that it is unprofitable, that allegation may be "important enough to require some sort of proof of its accuracy." *Id.* at 153. Our decision does not cast doubt on this principle.[4] If a union faced with an employer's claim of unprofitability would "give serious

---

[4] I agree with Judge Livingston that *Stroehmann* adopts a narrow understanding of the term "inability to pay"—an interpretation that I encourage the Board to reject along the lines proposed here. Importantly, however, *Stroehmann* and Judge Livingston's opinion do not confine *Truitt* to assertions of "inability to pay," thus giving that term talismanic importance. In *Stroehmann*, no duty to substantiate under *Truitt* could have applied because the union requested "comprehensive and detailed" financial information with "virtually no relevance to the issues at stake in bargaining" and "better designed to create a legal issue than to inform bargaining," thus indicating that the union rather than the employer was bargaining in bad faith. 95 F.3d at 223. Moreover, we explained that, although the relevant facility was unprofitable, the totality of the circumstances demonstrated that the employer did not place its unprofitability at issue in bargaining. *Id.*; *see also* note 1, *ante* (assertions must be "put in issue" to trigger a duty to substantiate). And here, because the Board's decision is based on a purported claim of "inability to pay," and because the Board did not offer a reasoned explanation for departing from our interpretation of that term in *Stroehmann*, I join Judge Livingston's opinion in full.

5

consideration to making the concessions the employer is demanding, or at least [to] making *some* concessions," *Nielsen I*, 854 F.2d at 1065, the duty to substantiate can, and generally should, apply.